FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 07, 2023

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:20-CV-304-SAB |
| Plaintiff, | **CONSENT DECREE** |
| v. | |
| BROCK MASLONKA, | |
| Defendant. | |

WHEREAS, Plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), filed the Complaint and First Amended Complaint herein against Brock Maslonka ("Defendant"), alleging that Defendant violated Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a);

CONSENT DECREE - 1

WHEREAS, the First Amended Complaint alleges that Defendant violated CWA Section 301(a) by discharging dredged or fill material and/or controlling and directing the discharge of dredged or fill material into waters of the United States in and near Perkins Slough, along Washington State Highway 20 in Pend Oreille County, Washington (the "Site") and more fully described in the First Amended Complaint, without authorization by the United States Army Corps of Engineers (the "Corps");

WHEREAS, the First Amended Complaint seeks (1) to enjoin the discharge of pollutants into waters of the United States in violation of CWA Section 301(a), 33 U.S.C. § 1311(a); (2) to require Defendant, at his own expense and at the direction of EPA, to restore and/or mitigate the damages caused by his unlawful activities; and (3) to require Defendant to pay civil penalties as provided in CWA Section 309(d), 33 U.S.C. § 1319(d);

WHEREAS, this Consent Decree is intended to constitute a complete and final settlement of the United States' claims under the CWA, as set forth in the First Amended Complaint regarding the Site;

WHEREAS, the United States and Defendant agree that settlement of this case is in the public interest and that entry of this Consent Decree is the most appropriate means of resolving the United States' claims under the CWA against Defendant in this case; and

WHEREAS, the Court finds that this Consent Decree is a reasonable and fair settlement of the United States' claims against Defendant in this case, and that this Consent Decree adequately protects the public interest in accordance with the CWA and all other applicable federal law.

CONSENT DECREE - 2

THEREFORE, before the taking of any testimony upon the pleadings, without further adjudication of any issue of fact or law, and upon consent of the parties hereto by their authorized representatives, it is hereby ORDERED, ADJUDGED and DECREED as follows:

## I. JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of these actions and over the parties pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

2.    Venue is proper in the Eastern District of Washington pursuant to CWA Section 309(b), 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and (c), because the Defendant resides in this District, the subject property is located in this District, and the causes of action alleged herein arose in this District.

3.    The First Amended Complaint states claims upon which relief can be granted pursuant to Sections 301, 309 and 404 of the CWA, 33 U.S.C. §§ 1311, 1319 and 1344.

## II. APPLICABILITY

4.    The obligations of this Consent Decree shall apply to and be binding upon Defendant, his agents, employees and servants, his successors and assigns, and any person, firm, association or corporation who is, or will be, acting in concert or participation with Defendant whether or not such person has notice of this Consent Decree. In any action to enforce this Consent Decree against Defendant, Defendant shall not raise as a defense the failure of any of his agents, employees, successors or assigns, or any person, firm, or corporation acting in

concert or participation with Defendant, to take any actions necessary to comply with the provisions hereof.

5.      The transfer of ownership or other interest in the "Restoration/ Mitigation Sites" (as described in Appendix A appended hereto and incorporated herein by reference) or "Preservation Sites" (as described in Appendix B appended hereto and incorporated herein by reference) shall not alter or relieve Defendant of his obligation to comply with all of the terms of this Consent Decree. At least 15 calendar days prior to the transfer of ownership or other interest in the Restoration/Mitigation Sites or the Preservation Sites, Defendant shall provide written notice and a true copy of this Consent Decree to his successors in interest and shall simultaneously notify EPA and the United States Department of Justice at the addresses specified in Section X below that such notice has been given. As a condition to any such transfer, Defendant shall reserve all rights necessary to comply with the terms of this Consent Decree.

## III. SCOPE OF CONSENT DECREE

6.      This Consent Decree shall constitute a complete and final settlement of all civil claims for injunctive relief and civil penalties alleged in the First Amended Complaint against Defendant under CWA Section 301 concerning the Site.

7.   It is the express purpose of the Parties in entering this Consent Decree to further the objectives set forth in CWA Section 101, 33 U.S.C. § 1251. All plans, construction, remedial maintenance, monitoring programs, and other obligations in this Consent Decree, or resulting from the activities required by this Consent

CONSENT DECREE - 4

Decree, shall have the objective of causing Defendant to achieve and maintain full compliance with, and to further the purposes of, the CWA.

8.    Except as in accordance with this Consent Decree, Defendant and Defendant's agents, successors and assigns are enjoined from discharging any pollutant into waters of the United States, unless such discharge complies with the provisions of the CWA and its implementing regulations.

9.    The Parties acknowledge that Nationwide Permit 32, found at 86 Fed. Reg. 73,579 (Dec. 27, 2021), authorizes any fill that was placed or deposited as of August 26, 2022, in the areas identified in Appendix A to remain in place, subject to the conditions provided in the Nationwide Permit and this Consent Decree. The Parties further acknowledge that Nationwide Permit 32 (86 Fed. Reg. 73,579) authorizes the discharge of dredged or fill material insofar as such discharge is necessary to complete the work required to be performed pursuant to this Consent Decree. Any such discharge of dredged or fill material necessary for work required by this Consent Decree shall be subject to the conditions of the Nationwide Permit and this Consent Decree.

10.    This Consent Decree is not and shall not be interpreted to be a permit or modification of any existing permit issued pursuant to Sections 402 or 404 of the CWA, 33 U.S.C. §§ 1342 or 1344, or any other law. Nothing in this Consent Decree shall limit the ability of the United States Army Corps of Engineers to issue, modify, suspend, revoke or deny any individual permit or any nationwide or regional general permit, nor shall this Consent Decree limit the EPA's ability to exercise its authority pursuant to Section 404(c) of the CWA, 33 U.S.C. § 1344(c).

CONSENT DECREE - 5

11.     This Consent Decree in no way affects or relieves Defendant of his responsibility to comply with any applicable federal, state, or local law, regulation or permit.

12.     This Consent Decree in no way affects the rights of the United States as against any person not a Party to this Consent Decree.

13.     The United States reserves any and all legal and equitable remedies available to enforce the provisions of this Consent Decree and applicable law.

14.     Except for Paragraphs 1–3, nothing in this Consent Decree shall constitute an admission of fact or law by any Party.

## IV. <u>SPECIFIC PROVISIONS</u>

### <u>Civil Penalties</u>

15.     Defendant shall pay a civil penalty to the United States in the amount of $50,000.00, within 30 calendar days of entry of this Consent Decree.

16.     Defendant shall make the above-referenced payment by FedWire Electronic Funds Transfer ("EFT" or wire transfer) to the United States Department of Justice account in accordance with current electronic funds transfer procedures, referencing U.S.A.O. file number 2020V00348, EPA Region 10, and the DOJ case number 90-5-1-1-21697. Payment shall be made in accordance with instructions provided to Defendant by the Financial Litigation Unit of the United States Attorney's Office for the Eastern District of Washington. Any payments received by the Department of Justice after 1:00 P.M. Pacific Time will be credited on the next business day.

17.      Upon payment of the civil penalty required by this Consent Decree, Defendant shall provide written notice, at the addresses specified in Section X of

CONSENT DECREE - 6

this Consent Decree, that such payment was made in accordance with Paragraph 16.

18.   Penalty payments under this Consent Decree pursuant to this Section or Section IX (Stipulated Penalties) are penalties within the meaning of Section 162(f)(1) of the Internal Revenue Code, 26 U.S.C. § 162(f)(1), and 26 C.F.R. § 1.162-21(a)(3)(i), and Defendant shall not deduct any penalties paid under this Consent Decree pursuant to this Section or Section IX (Stipulated Penalties) in calculating his federal income tax.

<u>Restoration, Mitigation, and Preservation</u>

19.   Defendant shall perform restoration/mitigation/preservation projects under the terms and conditions stated in Appendix A appended hereto and incorporated herein by reference.

20.   Upon completion of the terms and conditions of Appendix A, Defendant shall not mow, cut, clear, cultivate, dredge, excavate, farm, fill, dewater, drain or otherwise disturb in any manner whatsoever any location identified in Appendix A, except as specified in Appendix A or approved by EPA.

21.   Defendant shall perform the preservation projects under the terms and conditions stated in Appendix B appended hereto and incorporated herein by reference.

22.   Upon completion of the terms and conditions of Appendix B, Defendant shall not mow, cut, clear, cultivate, dredge, excavate, farm, fill, dewater, drain or otherwise disturb in any manner whatsoever any location identified in Appendix B, except as specified in Appendix B or approved by EPA.

CONSENT DECREE - 7

23.     To ensure that all parcels of land identified in Appendices A and B remain undisturbed in accordance with Paragraphs 20 and 22 above, Defendant shall, within 15 business days of entry of this Consent Decree, record a certified copy of this Consent Decree with the County Auditor for Pend Oreille County, Washington. Thereafter, each deed, title, or other instrument conveying an interest in any property identified in Appendix A or Appendix B shall contain a notice stating that the property is subject to this Consent Decree and shall reference the recorded location of the Consent Decree and any restrictions applicable to the property under this Consent Decree.

<div align="center">26 U.S.C. § 162(f)(2)(A)(ii) Identification</div>

24.     For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 1.162(f)(2)(A)(ii), and 26 C.F.R. § 1.162-21(b)(2), performance of Paragraphs 19 (including Appendix A), 21 (including Appendix B), 23, and 28–30 are restitution, remediation, or required to come into compliance with the law.

<div align="center">V. NOTICES AND OTHER SUBMISSIONS</div>

25.     Within 30 calendar days after the deadline for completing any task set forth in Appendix A or Appendix B of this Consent Decree, Defendant shall provide the United States with written notice, at the addresses specified in Section X of this Consent Decree, of whether or not that task has been completed.

26.     If the required task has been completed, the notice shall specify the date when it was completed, and explain the reasons for any delay in completion beyond the scheduled time for such completion required by the Consent Decree.

CONSENT DECREE - 8

27.     In all notices, documents or reports submitted to the United States pursuant to this Consent Decree, Defendant shall certify such notices, documents and reports as follows:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering such information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## VI. RETENTION OF RECORDS AND RIGHT OF ENTRY

28.     Until ten years after entry of this Consent Decree, Defendant shall preserve and retain all records and documents now in his possession or control or which come into his possession or control that relate in any manner to the performance of the tasks in Appendices A and B, regardless of any corporate retention policy to the contrary. Until ten years after entry of this Consent Decree, Defendant shall also instruct his contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to the performance of the tasks in Appendices A and B.

29.     At the conclusion of the document retention period, Defendant shall notify the United States at least 90 calendar days prior to the destruction of any such records or documents, and, upon request by the United States, Defendant shall deliver any such records or documents to EPA. Defendant may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Defendant asserts

CONSENT DECREE - 9

such a privilege, he shall provide the United States with the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Defendant. However, no documents, reports or other information created or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds that they are privileged.

30.    A. Until termination of this Consent Decree, as set forth in Section XV, the United States and its authorized representatives and contractors shall have authority at all reasonable times to enter the Restoration/Mitigation Sites and Preservation Sites to:

1) Monitor the activities required by this Consent Decree;

2) Verify any data or information submitted to the United States;

3) Obtain samples;

4) Inspect and evaluate Defendant's restoration and/or mitigation activities; and

5) Inspect and review any records required to be kept under the terms and conditions of this Consent Decree and the CWA.

Unless otherwise agreed to by the parties or in the event that the United States believes that a delay would pose or increase a threat of harm to the environment, the United States will provide Defendant with at least 24-hours' notice of its intention to enter the Restoration/Mitigation Sites and Preservation Sites.

CONSENT DECREE - 10

B. This provision of this Consent Decree is in addition to, and in no way limits or otherwise affects, the statutory authorities of the United States to conduct inspections, to require monitoring and to obtain information from Defendant as otherwise authorized by law.

## VII. DISPUTE RESOLUTION

31.     Any dispute that arises with respect to the meaning or requirements of this Consent Decree shall be, in the first instance, the subject of informal negotiations between the United States and Defendant to attempt to resolve such dispute in good faith. The period for informal negotiations shall not extend beyond 30 business days beginning with written notice by one Party to the other affected Party that a dispute exists, unless agreed to in writing by those Parties. If a dispute between the United States and Defendant cannot be resolved by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 30 calendar days after the end of the informal negotiations period, Defendant files a motion with the Court seeking resolution of the dispute. The motion shall set forth the nature of the dispute and a proposal for its resolution. The United States shall have 30 calendar days to respond to the motion and propose an alternate resolution. In resolving any such dispute, Defendant shall bear the burden of proving by a preponderance of the evidence that the United States' position is not in accordance with the objectives of this Consent Decree and the CWA, and that Defendant's position will achieve compliance with the terms and conditions of this Consent Decree and the CWA.

CONSENT DECREE - 11

32.    If the United States believes that a dispute is not a good faith dispute, or that a delay would pose or increase a threat of harm to the public or the environment, it may move the Court for a resolution of the dispute prior to the expiration of the 30 business-day period for informal negotiations. Defendant shall have 30 calendar days to respond to the motion and propose an alternate resolution. In resolving any such dispute, Defendant shall bear the burden of proving by a preponderance of the evidence that the United States' position is not in accordance with the objectives of this Consent Decree, and that Defendant's position will achieve compliance with the terms and conditions of this Consent Decree and the CWA.

33.    The filing of a motion asking the Court to resolve a dispute shall not extend or postpone any obligation of Defendant under this Consent Decree, except as provided in Paragraph 39 below regarding payment of stipulated penalties.

## VIII. FORCE MAJEURE

34.    Defendant shall perform the actions required under this Consent Decree within the time limits set forth or approved herein, unless the performance is prevented or delayed solely by events which constitute a Force Majeure event. A Force Majeure event is defined as any event arising from causes beyond the control of Defendant, including his employees, agents, consultants and contractors, which could not be overcome by due diligence and which delays or prevents the performance of an action required by this Consent Decree within the specified time period. A Force Majeure event does not include, among other things, increased

CONSENT DECREE - 12

costs of performance, changed economic circumstances, changed labor relations, changed circumstances arising out of the sale, lease or other transfer or conveyance of title or ownership or possession of a site. A Force Majeure event generally does not include the failure to obtain federal, state or local permits; however, for any such permit required to be obtained prior to August 15, 2023, as provided in Appendix A, a Force Majeure event may include the failure to obtain such permits, provided, for example, that full and complete applications are submitted by July 15, 2023.

35.    If Defendant believes that a Force Majeure event has affected Defendant's ability to perform any action required under this Consent Decree, Defendant shall notify the United States in writing within seven calendar days after the event at the addresses listed in Section X. Such notice shall include a discussion of the following:

A.    What action has been affected;

B.    The specific cause(s) of the delay;

C.    The length or estimated duration of the delay; and

D.    Any measures taken or planned by Defendant to prevent or minimize the delay and a schedule for the implementation of such measures.

Defendant may also provide to the United States any additional information that he deems appropriate to support his conclusion that a Force Majeure event has affected his ability to perform an action required under this Consent Decree. Failure to provide timely and complete notification to the United States shall constitute a waiver of any claim of Force Majeure as to the event in question.

CONSENT DECREE - 13

36.    If the United States determines that the conditions constitute a Force Majeure event, then the deadline for the affected action shall be extended by the amount of time of the delay caused by the Force Majeure event. Defendant shall coordinate with EPA to determine when to begin or resume the operations that had been affected by any Force Majeure event.

37.    If the parties are unable to agree whether the conditions constitute a Force Majeure event, or whether the length of time for fulfilling the provision of the Consent Decree at issue should be extended, any Party may seek a resolution of the dispute under the procedures in Section VII of this Consent Decree.

38.    Defendant shall bear the burden of proving (1) that the noncompliance at issue was caused by circumstances entirely beyond the control of Defendant and any entity controlled by Defendant, including his contractors and consultants; (2) that Defendant or any entity controlled by Defendant could not have foreseen and prevented such noncompliance; and (3) the number of calendar days of delay or nonperformance that were caused by such circumstances.

## IX. STIPULATED PENALTIES

39.    After entry of this Consent Decree, if Defendant fails to timely fulfill any requirement of the Consent Decree (including Appendix A, except as specified therein regarding reed canary grass, and Appendix B), Defendant shall pay a stipulated penalty to the United States for each violation of each requirement of this Consent Decree, unless otherwise excused, as follows:

A.    For calendar Day 1 up to and including calendar Day 30 of noncompliance        $1,000.00 per day

B.    For calendar Day 31 up to and including calendar Day 60 of noncompliance        $2,000.00 per day

CONSENT DECREE - 14

C.    For calendar Day 61 and beyond
      of noncompliance                                    $3,000.00 per day

Defendant shall pay any stipulated penalty within 30 Days after receiving the United States' written demand. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties due to it under this Consent Decree.

40.    Any disputes concerning the amount of stipulated penalties, or the underlying violation that gives rise to the stipulated penalties, that cannot be resolved by the parties pursuant to the Dispute Resolution provisions in Section VII and/or the Force Majeure provisions in Section VIII shall be resolved upon motion to this Court as provided in Paragraphs 31 and 32.

41.    The filing of a motion requesting that the Court resolve a dispute shall stay Defendant's obligation to pay any stipulated penalties with respect to the disputed matter pending resolution of the dispute. Notwithstanding the stay of payment, stipulated penalties shall continue to accrue from the first calendar day of any failure or refusal to comply with any term or condition of this Consent Decree. In the event that Defendant does not prevail on the disputed issue, stipulated penalties shall be paid by Defendant as provided in this Section and date back to the original date of noncompliance.

42.    To the extent Defendant demonstrates to the Court that a delay or other noncompliance was due to a Force Majeure event (as defined in Paragraph 34 above) or otherwise prevail on the disputed issue, the Court shall excuse the stipulated penalties for that delay or noncompliance.

CONSENT DECREE - 15

43.    In the event that a stipulated penalty payment is applicable and not made on time, interest will be charged in accordance with the statutory judgment interest rate provided for in 28 U.S.C. § 1961. The interest shall be computed daily from the time the payment is due until the date the payment is made. The interest shall also be compounded annually.

44.    Defendant shall make any payment of a stipulated penalty by FedWire Electronic Funds Transfer ("EFT" or wire transfer) to the United States Department of Justice account in accordance with current electronic funds transfer procedures, referencing U.S.A.O. file number 2020V00348, EPA Region 10, and the DOJ case number 90-5-1-1-21697. Payment shall be made in accordance with instructions provided to Defendant by the Financial Litigation Unit of the United States Attorney's Office for the Eastern District of Washington. Any payments received by the Department of Justice after 1:00 P.M. (Pacific Time) will be credited on the next business day. Further, upon payment of any stipulated penalties, Defendant shall provide written notice, at the addresses specified in Section X of this Consent Decree.

## X. <u>ADDRESSES</u>

45.    All notices and communications required under this Consent Decree shall be made electronically to the parties through each of the following persons and email addresses:

A.    <u>TO EPA</u>:

   Matthew Moore, Assistant Regional Counsel
   United States Environmental Protection Agency, Region 10
   1200 Sixth Avenue, Suite 155
   Seattle, WA 98101
   moore.johnm@epa.gov

CONSENT DECREE - 16

Charissa Bujak, Case Officer
United States Environmental Protection Agency, Region 10
Idaho Operations Office
950 W Bannock, Suite 900
Boise, ID 83702
bujak.charissa@epa.gov

B.    TO THE UNITED STATES DEPARTMENT OF JUSTICE:

Gus Maxwell, Attorney
U.S. Department of Justice – ENRD
Environmental Defense Section
999 18th Street; South Terrace; Suite 370
Denver, CO 80207
gustavus.maxwell@usdoj.gov

Chief, Environmental Defense Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
MailProcessing_EDS.ENRD@usdoj.gov

C.    TO DEFENDANT:

Robert F. Greer, Attorney
Etter, McMahon, Lamberson, Van Wert & Oreskovich, P.C.
618 W. Riverside, Suite 210
Spokane, WA 99201
robg@ettermcmahon.com

Rick Wetmore, Attorney
Dunn & Black, P.S.
111 N. Post, Suite 300
Spokane, WA 99201
rwetmore@dunnandblack.com

## XI. COSTS OF SUIT

46.    Each Party to this Consent Decree shall bear its own costs and

attorneys' fees in this action. Should Defendant subsequently be determined by the

Court to have violated the terms or conditions of this Consent Decree, Defendant

shall be liable for any costs or attorneys' fees incurred by the United States in any

CONSENT DECREE - 17

action against Defendant for noncompliance with or enforcement of this Consent Decree.

## XII. PUBLIC COMMENT

47.    The Parties acknowledge that after the lodging and before the entry of this Consent Decree, final approval by the United States is subject to the requirements of 28 C.F.R. § 50.7, which provides for public notice and comment. The United States reserves the right to withhold or withdraw its consent to the entry of this Consent Decree if the comments received disclose facts which lead the United States to conclude that the proposed judgment is inappropriate, improper, or inadequate. Defendant agrees not to withdraw from, oppose entry of, or to challenge any provision of this Consent Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Consent Decree.

## XIII. CONTINUING JURISDICTION OF THE COURT

48.    This Court shall retain jurisdiction over this action in order to enforce or modify the Consent Decree consistent with applicable law or to resolve all disputes arising hereunder as may be necessary or appropriate for construction or execution of this Consent Decree. During the pendency of the Consent Decree, any Party may apply to the Court for any relief necessary to construe and effectuate the Consent Decree.

## XIV. MODIFICATION

49.    Upon its entry by the Court, this Consent Decree shall have the force and effect of a final judgment.

CONSENT DECREE - 18

50.    Any modification of Appendix A or Appendix B to this Consent Decree shall be in writing, and shall not take effect unless signed by the United States and Defendant.

51.    Except as provided in Paragraph 50, any modification of this Consent Decree shall be in writing, and shall not take effect unless signed by both the United States and Defendant, and approved by the Court.

## XV. TERMINATION

52.    Except for Paragraphs 20 and 22, and the deed restrictions required in Appendix B, this Consent Decree may be terminated by either of the following:

A.    Defendant and the United States may at any time make a joint motion to the Court for termination of this Consent Decree or any portion of it; or

B.    Defendant may make a unilateral motion to the Court to terminate this Consent Decree after each of the following has occurred:

1.    Defendant has obtained and maintained compliance with all provisions of this Consent Decree, including Appendix A and Appendix B, and the CWA for 12 consecutive months;

2.    Defendant has paid all penalties and other monetary obligations hereunder and no penalties or other monetary obligations are outstanding or owed to the United States;

CONSENT DECREE - 19

3.   Defendant has certified compliance pursuant to subparagraphs 1 and 2 above to the Court and all Parties; and

4.   Within 45 calendar days of receiving such certification from Defendant, EPA has not contested in writing that such compliance has been achieved. If EPA disputes Defendant's full compliance, this Consent Decree shall remain in effect pending resolution of the dispute by the Parties or the Court.

IT IS SO ORDERED.

Dated and entered this _7th_ day of _September_ 2023.

_____
United States District Judge

ON BEHALF OF THE UNITED STATES:

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

_____      Dated: _7/13/2023_
**MARK A. NITCZYNSKI,** Senior Trial Counsel
GUS MAXWELL, Trial Attorney
United States Department of Justice
Environmental Defense Section
999 18th Street; South Terrace, Suite 370
Denver, CO 80202
Phone: (303) 844-1498 (Nitczynski)
Phone: (303) 844-1437 (Maxwell)
Fax: (303) 844-1350
Email: mark.nitczynski@usdoj.gov
Email: gustavus.maxwell@usdoj.gov

CONSENT DECREE - 20

ON BEHALF OF THE UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY:

JOSEPH THEIS   Digitally signed by JOSEPH THEIS
Date: 2023.07.13 21:17:17 -04'00'          Dated: 7-14-23

**Joseph Theis**, Acting Director
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

Dated: 7/12/23

**Beverly Li**, Regional Counsel
Region 10
United States Environmental Protection Agency


ON BEHALF OF DEFENDANT:

_megan Clark_          Dated: 7-11-23

**ROBERT F. GREER**
MEGAN C. CLARK
Etter, McMahon, Lamberson,
Van Wert & Oreskovich, P.C.
618 W. Riverside, Suite 210
Spokane, WA 99201
Phone: (509) 747-9100
Fax: (509) 623-1439
Email: robg@ettermcmahon.com
Email: mclark@ettermcmahon.com


CONSENT DECREE - 21

# Appendix A
# to Consent Decree


# Restoration/

# Mitigation Plan

# Conceptual Perkins Slough Restoration/Mitigation Plan

## Maslonka Property
## Cusick, Pend Oreille County, Washington

**June 2023**

# Table of Contents

Introduction ............................................................................................................................ 3

Project Location, Overview, and Prior Notifications to EPA ........................................... 3

Site Description ..................................................................................................................... 4

Compliance With Applicable Law ...................................................................................... 5

Specifications for Restoration/Mitigation ......................................................................... 5

    A.    Dam and Sediment Removal, and Slope Stabilization ............................................ 7

        1.    Work Preparation ................................................................................................. 7

        2.    Dam Removal, Removal of Adjacent Fill, and Stabilization ........................... 7

        3.    Additional Downstream Sediment Removal ................................................... 9

        4.    Restoration of Borrow Area ............................................................................... 11

    B.    Fencing (Including Hardened Entries and Wildlife Openings) ............................ 11

    C.    Restoration of River Left, River Right 1, and River Right 2 ............................... 13

    D.    Completion Dates, Documentation of Work, Monitoring, and General Contingency and Adaptive Management Measures ............................................................................. 13

    E.    Additional Success Criteria/Performance Standards and Contingency and Adaptive Measures for Revegetation Work ...................................................................................... 15

        1.    Native Plantings .................................................................................................. 15

        2.    Seeding ................................................................................................................. 17

Injunction; "Restoration/Mitigation Sites" ..................................................................... 18

Literature Cited .................................................................................................................... 19

2

## Introduction

This restoration/mitigation plan has been developed for submission to the Court as an appendix to, and to be included as part of, the Consent Decree in *United States v. Maslonka*, No. 2:20-CV-00304-SAB (E.D. Wash.).  The defendant in this action is Brock Maslonka, who is solely responsible for performance under the Consent Decree, including this restoration/mitigation plan.  Mr. Maslonka also is responsible for timely raising any concerns regarding the work and other measures set forth in this plan.

## Project Location, Overview, and Prior Notifications to EPA

This restoration/mitigation plan is to be implemented primarily on property owned by Mr. Maslonka, approximately 2.5 miles north of the Town of Cusick, Pend Oreille County, Washington. The subject property is located in the NW ¼ of Township 33 North, Range 44 East, Section 07 in Pend Oreille County, Washington.   The County Parcel Number that is the main focus of this plan is 443307509002, and certain portions of this plan also include County Parcel Numbers 443318500002, and 443307509001.  This plan focuses on mitigation of impacts stemming from earthwork and dam construction in Perkins Slough during September 2015, and emergency response work within Perkins Slough in February 2016.  The dam is located approximately 0.25 miles east of Highway 20 and 0.5 miles west of the Pend Oreille River along Perkins Slough.  The latitude/longitude coordinates for the approximate center of the dam site are 48.376669/-117.300364.  (For the general location and aerial depictions of the property, *see* Figure 1 and Photograph 1.)

Among other things, this plan is intended to restore the previously filled segment of Perkins Slough and to enhance vegetative structure and habitat functioning in accordance with the general principles outlined in the *Wetland Mitigation in Washington State – Part 1: Agency Policies and Guidance, Version 2*, Washington State Department of Ecology, U.S. Army Corps of Engineers Seattle District, and U.S. Environmental Protection Agency Region 10 (2021) (Washington State Department of Ecology Publication #21-06-003).

The restoration/mitigation efforts include the following general tasks: removal of fill from Perkins Slough, including removal of the dam and the sediment deposited upstream and downstream of the dam; stabilizing the dam site and nearby areas; grading the bottom and banks of Perkins Slough to pre-disturbance conditions, including creating smooth, stable transitions to surrounding slopes; revegetation through seeding, planting of prescribed native plants, and weed removal and control

3

measures at designated locations; and fencing in designated areas sufficient to exclude cattle, with wildlife openings and hardened entries for livestock to access water without crossing to the east side of the slough.  The overall restoration/mitigation approach and more details about the components of the plan and required follow-up efforts are discussed in the subsequent sections of this plan and its attachments.

No less than 45 days before Mr. Maslonka commences the on-site work (other than fencing, including hardened entries and wildlife openings) described in this plan, Mr. Maslonka shall provide EPA with notice of the "target" date on which Mr. Maslonka intends to commence that work.  In addition, no less than 30 days before Mr. Maslonka commences that work, Mr. Maslonka shall provide EPA with notice of the actual date on which Mr. Maslonka will commence that work.

## Site Description

The restoration/mitigation site is located along a segment (reach) of Perkins Slough.  The site currently contains fill material linked to a constructed earthen dam within the channelized portion of Perkins Slough and it includes other areas near the slough.  Perkins Slough generally supports a mix of herbaceous vegetation (mainly dominated by reed canary grass) and scattered, low-growing shrub species (mainly hawthorns and snowberry) and some trees.  Perkins Slough is one piece of the tributary and wetlands ecosystems that serve the Pend Oreille River Valley north of Cusick and that support a variety of flora and fauna.

The dam is depicted in Photographs 2-6 and 9 and Figures 13 and 14 attached hereto. Estimates of the volume of fill material in the dam have ranged from approximately 700 to 1,000 cubic yards of fill material.  In addition, the sediment has accumulated near the dam, including in a sediment plume downstream of the dam, as depicted in Photographs 7-9 attached hereto and Figures 13 and 14 attached hereto.

The Pend Oreille River flows northerly, approximately 0.5 miles to the east of the site.  Perkins Slough, which traverses through the site, has connectivity with the Pend Oreille River.  Water levels are seasonally influenced from the river and run-off from higher adjacent elevations.

Within the Cusick area, average temperatures are around 79°F in the summer and 37°F in the winter, with an average annual rainfall of 26.0 inches and average snowfall of 53.0 inches.  Land uses within the general proximity of the restoration site are almost exclusively agricultural.

CONSENT DECREE & APPENDICES 026

## Compliance With Applicable Law

All work performed under this plan shall be performed in accordance with applicable law, including, without limitation, the requirements of all applicable laws, permits, conditions, and authorizations.

This restoration/mitigation plan is not a permit or authorization issued under any law.  To perform the work set forth in this restoration/mitigation plan, Mr. Maslonka will need to obtain all necessary permits and other authorizations required by federal, state, local, and any other regulatory bodies. It is anticipated Mr. Maslonka will be able to timely obtain the necessary permits and authorizations to perform under the terms of this plan. To the extent Mr. Maslonka is unable to timely obtain permits or authorizations required for work to be performed starting as early as August 15, 2023 (as set forth below), Mr. Maslonka shall immediately notify EPA and provide EPA with an estimated date of compliance.  It is anticipated that, as appropriate, EPA will support Mr. Maslonka's requests for permits with federal, state, and/or local bodies in order to comply with the deadlines set forth in Table 4.

The following permits or authorizations are listed for informational purposes: (a) Clean Water Act section 404 (Nationwide Permit 32); (b) Section 106 of the National Historic Preservation Act; (c) Clean Water Act section 401 Water Quality Certification (Administered by the Washington State Department of Ecology and by the Kalispel Tribe of Indians); (d) Hydraulics Projects Approval (Administered by Washington Department of Fish and Wildlife); and (e) Shoreline Master Program (Pend Oreille County).  The list does not necessarily include all such permits or authorizations required and not all of those listed necessarily are required here.

## Specifications for Restoration/Mitigation

The restoration/mitigation work described in this plan must be accomplished safely and without further environmental damage.  The work must be performed in accordance with the descriptions below and must achieve the project standards and success criteria/performance standards set forth below and those set forth in Table 2 attached hereto.

The project standards summarize the restoration/mitigation work that is required and guide the work activities toward proper completion, including meeting the success criteria/performance standards, which set forth criteria that must be met for each sub-component of the work.  Mr. Maslonka also shall provide the Measurements/Documentation elements set forth in Table 2. Those elements set forth the methods required to document the work and whether it has been

5

completed properly.  In addition, if any component or sub-component of the work does not meet the success criteria/performance standards set forth in Table 2 (after the work is initially completed or subsequently monitored for compliance, as appropriate), then Mr. Maslonka shall implement the Recommended First Response Contingency and Adaptive Management Measures. Those measures are the first responses to foreseeable failures that may occur (e.g., plant mortality). If those measures do not adequately address the failure to achieve the project standards and success criteria/performance standards, then Mr. Maslonka shall coordinate with EPA to develop and implement other measures or other restoration/mitigation work to address those failures.

As discussed further below, native plantings are required at five locations: (1) the "Dam and Sediment Removal and Slope Stabilization Area"; (2) the "Borrow Area"; (3) "River Left"; (4) River Right 1"; and (5) "River Right 2."  It is expected that approximately 25% of the native plantings will consist of live cuttings from local sources (e.g., Mr. Maslonka's property) and approximately 75% will be bare root or potted/containerized stock that is sourced from Eastern Washington, with a particular focus on the Cusick, Pend Oreille County and Spokane County area (provenance).

The discussion below refers to a planting "take-off table" (Table 3, "Planting Recommendations and Take-Offs By Planting Zone") that shall guide the native plantings and seeding work required under this plan.  The native plantings and seeding work must be completed in general accordance with Table 3 but Mr. Maslonka retains discretion to adjust the native plantings and seeding if necessary. No later than July 15, 2023, Mr. Maslonka shall submit a revised planting "take-off" table (including anticipated weed removal and control measures) to the Environmental Protection Agency (EPA) for review, and must receive approval from EPA prior to conducting any of the plantings or seeding work.  After the native plantings and seeding have been completed, Mr. Maslonka shall submit "As-Planted" tables that specify and document any weed removal and control measures implemented, the native plantings that were planted, and the seeding work performed, in each area (and within each "zone" of the River Left area, as discussed further below).

It was anticipated initially that all of the native planting work included in this plan would be completed in the fall of 2023. However, Mr. Maslonka may not be able to acquire all of the containerized native plants needed to complete those plantings in 2023, and so a partial planting in 2024 may be necessary. Accordingly, Mr. Maslonka shall make every effort to complete all of the required native plantings (with the exception of installing cuttings, which is discussed below) by October 15, 2023, but, if Mr. Maslonka is unable to complete all of those plantings despite such

6

efforts, then: (a) Mr. Maslonka shall complete the remaining native plantings no later than June 15, 2024; (b) the "As Planted" submission (discussed immediately above and discussed below in Section D) that Mr. Maslonka is required to provide to EPA by December 1, 2023 shall address the native plantings completed in 2023 and describe which native plantings remain to be completed in 2024; (c) Mr. Maslonka's "As Planted " submission in 2024 shall address the native plantings completed in 2024; and (d) 2024 shall be "year zero" (discussed below in Section D) for all of the native plantings in each of the five areas where remaining native plantings are completed in 2024. Even if Mr. Maslonka is unable to complete all of the containerized native plantings in the fall of 2023, Mr. Maslonka shall: (a) no later than October 15, 2023, install live stakes, complete seeding, and initiate weed removal and control measures; and (b) no later than November 15, 2023, or the first set of 2023 hard frosts, whichever is earlier, install cuttings.

## A.  Dam and Sediment Removal, and Slope Stabilization

### 1.  Work Preparation

Prior to initiation of the on-site work discussed in this section A, Mr. Maslonka shall hire a qualified Geotechnical/Engineering professional to design the work, including, without limitation, removal plans, grading plans, work sequencing, installation of "Best Management Practices" (BMPs) protections, upland disposal location for removed fill, and contingency measures.  Mr. Maslonka shall submit these plans to the Environmental Protection Agency (EPA) for review no later than July 15, 2023, and must receive approval from EPA prior to initiating the work.  Prior to commencing this work, Mr. Maslonka also shall install required aquatic species protection systems, water diversion/by-pass and dewatering systems (likely including a coffer dam), and erosion and sediment control BMPs (e.g., sediment fences, energy dissipation systems) in compliance with the Construction Stormwater General Permit for Washington State (Construction Stormwater General Permit - Washington State Department of Ecology).

### 2.  Dam Removal, Removal of Adjacent Fill, and Stabilization

The location for this component and associated sub-components of the work includes Perkins Slough and a 30-foot revegetated riparian buffer area.  This location is depicted in Figures 2 and 3 as the "Dam and Sediment Removal and Slope Stabilization Area." Photographs 2-10 and Figures 13 and 14 also depict this area.

7

All work below the Ordinary High Water Mark (OHWM) at this location shall take place between August 15 - October 15, 2023, and must be done during low flow and with dry conditions (during dry parts of the dry season). In addition, to avoid soil compaction, appropriate low impact and low ground pressure equipment shall be used for this sub-component of the work (e.g., excavation, loading, and hauling of excavated materials; grading channel banks; and stabilizing channel banks and slopes). For work sequencing, it is expected that the sediment plume downstream of the dam, which is depicted in Figures 2 and 4 as the "Additional Downstream Sediment Removal Area" and is discussed further below, will be removed prior to removal of the dam fill and other fill that has accumulated within the banks of Perkins Slough in the Dam and Sediment Removal and Slope Stabilization Area.

All of the dam fill (estimated at approximately700-1,000 CY) within the channel of Perkins Slough shall be removed. All of the other fill that has accumulated within the banks of Perkins Slough in the Dam and Sediment Removal and Slope Stabilization Area also shall be removed.

The removed fill may be used at this location (i.e., within the Dam and Sediment Removal and Slope Stabilization Area), where needed, to provide appropriate grade and depth (including terraces or benches, as described below) for prescribed plantings in this area. Fill that is not used for these activities shall first be placed in the Borrow Area that is depicted in Figures 2 and 5. If there is fill remaining after sufficient fill has been placed in the Borrow Area to complete the restoration of that area as described below, then the remaining sediment fill shall be spread evenly at an upland location that is at least 100 feet from the OHWM of Perkins Slough and has been approved by EPA.

After removal of the fill within the Dam and Sediment Removal and Slope Stabilization Area, the channel bottom of Perkins Slough shall be restored to the "pre-disturbance" condition that existed before the dam was installed and sediment accumulated. The channel bottom of Perkins Slough that was beneath the fill must be finish graded to match original grades and to form smooth transitions to existing upstream and downstream channel grades, channel banks and side slopes. Mr. Maslonka also shall grade the channel banks and adjacent side slopes to match original grades and form smooth transitions to the "pre-disturbance" channel bottom, channel banks and slopes. To the extent feasible, Mr. Maslonka shall avoid disturbing native vegetation.

Mr. Maslonka will create terraces or benches (3 to 5 feet in width) below, at, and slightly above the OHWM on the slough's side slopes to minimize the potential for erosion and increase the

8

complexity of possible planting surfaces and submerged areas.  Figure 6 provides a depiction of how the terracing or benching will be done.

Mr. Maslonka shall then stabilize the graded channel banks and slopes with erosion and sediment control BMPs and bioengineering techniques, using a combination of natural materials such as organic geotextiles (e.g. coir cloth), large wood, mulch, native plantings, or the like.  Bank-hardening materials such as concrete and gabions shall not be used. The use of riprap along the toe or transitional areas could be considered for use if bio-engineered techniques are shown not to be effective. If applied, riprap quantities shall be utilized sparingly.

Planting of native plants (and seeding if it is included in the planting take-off table submitted by Mr. Maslonka and approved by EPA) shall then be performed in general accordance with Table 3. In addition, Mr. Maslonka may include weed removal and control measures.

### 3.  Additional Downstream Sediment Removal

The location of this work is the sediment plume downstream of the dam that is depicted in Figures 2 and 4 as the "Additional Downstream Sediment Removal Area."   Photographs 2 and 7-10 also depict portions of this area.  Excavated pits and probes from 2021 show that the plume is generally wedge-shaped and narrows in width downstream. The depth of the sediment plume varies.  The point of contact between the sediment material and the original channel bottom of Perkins Slough typically is clear, abrupt, and distinct.

All work below the OHWM at this location shall take place between August 15 - October 15, 2023, and must be done during low flow and with dry conditions (during dry parts of the dry season).  In addition, to avoid soil compaction, appropriate low impact and low ground pressure equipment shall be used for this sub-component of the work (e.g., excavation, loading, and hauling of excavated materials).  As discussed above, it is expected that the sediment in this area will be removed prior to the removal of the dam fill and other fill that has accumulated within the banks of Perkins Slough in the Dam and Sediment Removal and Slope Stabilization Area. It also is expected that Mr. Maslonka will excavate to the point of contact between the sediment plume material and the original channel bottom (i.e., neither shallower nor deeper). It is anticipated that the work will start at the downstream end of the plume and move upstream toward the dam unless downstream ponding or saturation prevents that sequencing; however, Mr. Maslonka's agents may alter this anticipated sequencing based on their expertise and experience, and using accepted industry practices. Furthermore, it is expected that EPA and/or an outside consultant for EPA will be present on-site

9

when this work commences and will observe some or all of this sediment removal work, including achievement of the finish grades. EPA and/or its outside consultant will provide direction (if requested) regarding the removal and will determine in their reasonable discretion whether the work has been completed in accordance with this plan.

It is anticipated that all of the fill (sediment) in the Additional Downstream Sediment Removal Area will be removed. Nonetheless, if Mr. Maslonka is unable, despite demonstrated good-faith efforts, to secure access to the portion of the sediment plume that extends downstream beyond his property line, then that portion of the sediment plume need not be removed. In addition, if any portion of the sediment plume in the Additional Downstream Sediment Removal Area is covered with surface water when the removal work is to occur, and Mr. Maslonka determines that the removal of that portion of the sediment plume should not take place because removal may cause environmental damage, then Mr. Maslonka shall provide EPA with notice and allow EPA ten working days thereafter to assess and recommend whether removal of that portion of the sediment plume should occur. Mr. Maslonka shall then follow EPA's recommendation.

The removed fill (sediment) may be used within the Dam and Sediment Removal and Slope Stabilization Area, where needed, to provide appropriate grade and depth (including terraces or benches, as described above) for prescribed plantings in that area. Fill that is not used for these activities shall first be placed in the Borrow Area that is depicted in Figures 2 and 5. If there is fill remaining after sufficient fill has been placed in the Borrow Area to complete the restoration of that area as described below, then the remaining sediment fill shall be spread evenly at an approved upland location at least 100 feet from the OHWM of Perkins Slough.

After the sediment plume in the Additional Downstream Sediment Removal Area is removed, the channel bottom of Perkins Sough shall be restored to the "pre-disturbance" condition that existed before the dam was installed and sediment accumulated. The channel bottom of Perkins Slough that was beneath the sediment plume must be finish graded to match original grades and to form smooth transitions to existing upstream and downstream channel grades, channel banks and side slopes. To the extent feasible, Mr. Maslonka shall avoid disturbing native vegetation.

10

### 4.  Restoration of Borrow Area

The Borrow Area is adjacent to the dam and south of Perkins Slough, and is depicted in Figures 2 and 5.  It is the area from which Mr. Maslonka removed fill material for construction of the dam. The restoration of the Borrow Area as described in this plan must be completed no later than October 15, 2023.

During August 2022, technical representatives of EPA and Mr. Maslonka observed that the soil in the Borrow Area was quite dry and that there was pronounced compaction and cracking of the surface soils.  In addition, organic matter content in the Borrow Area soil was quite low.  The dry, compacted, and relatively infertile soil presents difficult conditions for successful revegetation unless efforts are made to address those conditions.

Prior to replacement of any soil in the Borrow Area, the surface soils in the Borrow Area shall be ripped or disced (and thus lofted) with equipment passes that are generally perpendicular to each other.  After the existing soils in the Borrow Area have been lofted, the Borrow Area must be re-filled with a combination of (a) material from the removal of the dam and/or the sediment that has accumulated near and downstream of the dam, as discussed above, and (b) organic material (which can be locally sourced, including from composted manure obtained from Mr. Maslonka's ranching operations).  It is expected that at least four inches of these combined materials will be required to support successful revegetation efforts.

These materials must be mixed into the lofted surface soils using an efficient combination of equipment such as a track hoe, a bulldozer rigged with gang rippers, or a tractor/disc.  In addition, the fill replaced in the Borrow Area must be finish graded to match the grades of the surrounding area and to form smooth transitions to those surrounding areas.

After the Borrow Area has been re-filled as discussed above, planting of native plants shall be performed in general accordance with Table 3.  The Borrow Area also must be broadcast or hydro seeded with a native mix of grasses in general accordance with Table 3.  Prior to planting and seeding, the borrow area must be cleared of any residual non-native weeds.

### B.  Fencing (Including Hardened Entries and Wildlife Openings)

No later than May 15, 2024, fencing shall be installed in accordance with Figures 2 and 7.  After October 15, 2023, Mr. Maslonka shall make every effort to ensure cattle are excluded from the Dam

11

and Sediment Removal and Slope Stabilization Area, Additional Downstream Sediment Removal Area, River Left, River Right 1, and River Right 2 (including the Borrow Area), prior to the fence being installed.  Consistent with those depictions, Mr. Maslonka will install the fencing so that it extends: (a) starting in the south, along the west side of Perkins Slough from the western boundary of Mr. Maslonka's property near Route 20 to approximately the location where the dam was installed; and (b) to the north and northeast from approximately the location where the dam was installed, along the west side of Perkin's Slough, to where Perkins Slough meets the east boundary of Mr. Maslonka's property.  With the exception of the hardened entries discussed below, the fencing must exclude cattle.

Three hardened entries must be installed in the new or existing fence along the west side of Perkins Slough, in accordance with the locations depicted on Figures 4 and 7.  The entries shall provide livestock with access to water without causing harm to the Perkins Slough channel banks and they shall not allow cattle to cross to the east side of the slough.  The hardened entries are a riparian zone management BMP and shall be designed and installed in general accordance with the depictions in Figure 8c.  (Figures 8a and 8b are depictions of hardened entries that are included for illustrative purposes.  The hardened entries must be installed in accordance with Figure 8c.)  No later than January 15, 2024, Mr. Maslonka shall submit plans for constructing the hardened entries to EPA.  These design documents shall include: the location of the hardened entries; a depiction of the hardened entries; the maximum quantity of rock placed to be placed below the OHWM; the size and shape of the rock; the sourcing of the rock; the maximum size, number, and location of pilings to be driven (if any); construction sequencing; BMPs; and applicable avoidance, minimization and mitigation of any temporary and permanent impacts to aquatic resources that may occur during installation.  Mr. Maslonka must receive approval from EPA prior to installing the hardened entries.

There shall be two wildlife openings in the new fence that is to be constructed.  Those openings shall be sufficiently wide to allow deer to pass through but narrow enough to prevent cattle to pass through.  The wildlife openings shall be designed and installed in accordance with one of the depictions in Figures 9A through 9E.

The fencing (along with the hardened entries and wildlife openings) shall be maintained for a minimum of 10 years after the Effective Date of the Consent Decree and thereafter for as long as Mr. Maslonka retains a beneficial interest in the fenced property and grazes cattle on that property.

## C.  Restoration of River Left, River Right 1, and River Right 2

Revegetation with native plantings shall be conducted, and enhanced weed removal and control measures shall be implemented, at the three locations depicted in Figures 2, 7, 10, 11 and 12 as River Right 1, River Right 2, and River Left.  Cattle will be excluded from these areas by fencing, as discussed above.

Specifically, in the areas depicted as River Right 1, River Right 2, and River Left, planting of native plants (and seeding if it is included in the planting take-off table submitted by Mr. Maslonka and approved by EPA) shall be performed in general accordance with Table 3 (Planting Recommendations and Take-Offs By Planting Zone).  Enhanced weed removal and control measures also shall be performed in River Right 1, River Right 2, and River Left.  The restoration work at these sites shall be completed without damaging existing native plants.

As set forth in Figure 10 and Table 3, the River Left area includes two distinct zones: (a) the "Point Bar Treatment Zone" immediately above and below the OHWM and (b) the "Hay Field Treatment Zone" located due west of the existing riparian forest and scrub/shrub plant community.  These two zones shall be planted with separate sets of native trees and shrubs.  (Seeding will be required in one or both of these zones if it is included in the planting take-off table approved by EPA).

## D.  Completion Dates, Documentation of Work, Monitoring, and General Contingency and Adaptive Management Measures

Sections A, B and C above set forth certain dates by which components or sub-components of the work are to be completed.  A summary of such completion dates is also set forth in Table 4 attached hereto.

As set forth in Table 2, Mr. Maslonka shall provide "As Built" or "As Planted" submissions to EPA for each sub-component of the work.   The submissions shall depict the completed work and must include a photo inventory of that work.  The specifications for the photo inventory for each sub-component are included in Table 2.  The "As-Built" and "As Planted" submissions must be made by December 1 of the year that Mr. Maslonka completes the sub-component of the work.

Mr.  Maslonka shall monitor all areas where work is required under this plan.   After "year zero," which is the year that Mr. Maslonka completes the sub-component of the work and makes the corresponding "As Built" or "As Planted" submissions to EPA, monitoring (and reporting) is required in years 1, 2, 3, 5, and 7 (i.e., "year zero" plus 1, 2, 3, 5, and 7).

13

Mr. Maslonka shall submit monitoring reports in electronic format (via email or other electronic transmission, and not on hard devices such as flash drives or CDs) to EPA by December 1 of each year that the monitoring is required.  The reports shall be formatted consistent with the 2016 *Mitigation Monitoring Report* form generated by the Seattle District of the U.S. Army Corps of Engineers.[1]  The reports must include a photo inventory of each sub-component of the work, consistent with the specifications for the photo inventories that are included in Table 2.  Each photograph must be geotagged or include a description of the latitude and longitude for the location where the photograph was taken.

For each sub-component of the work set forth in Table 2, the reports must address achievement of, progress toward, or movement away from the applicable success criteria/performance standards. The reports must address any issues that may impact the achievement of the project standards and success criteria/performance standards.

The reports also must document the stability of finish grades, side slope bioengineering and planting areas, and cattle exclusion fencing (including wildlife openings and hardened entries).  The reports must catalogue plantings (and seeding, where applicable) according to their condition (i.e., living and vigorous, stressed, or dead) and document non-native plant and invasive weed conditions, including the percentage of weed cover in the revegetation area.  The reports must also identify any maintenance concerns, including the need for other maintenance activities, and any contingency and any adaptive management measures employed.

Contingency and adaptive management measures must be employed for each sub-component of the work that is not meeting the success criteria/performance standards set forth in Table 2 (and as discussed below in more detail for revegetation work).  In that event, Mr. Maslonka shall implement the Recommended First Response Contingency and Adaptive Management Measures as set forth in Table 2 (and as discussed below in more detail for revegetation work).  If those measures do not correct the deficiencies, then Mr. Maslonka shall coordinate with EPA to implement other measures that may include, for example: additional plantings; supplemental watering; re-grading; additional weed treatments and removals; re-seeding; extension of the monitoring period; and additional

---

[1]  The form is available at:
https://www.nws.usace.army.mil/Portals/27/docs/regulatory/Forms/Mitigation%20MonRpt%20for%20rip%20planting_18Mar2016.pdf.

monitoring points.  If such other measures do not cause the sub-component of the work to meet the applicable success criteria/performance standards, then Mr. Maslonka shall coordinate with EPA about developing and implementing other restoration/mitigation work.  The nature and scope of such additional work shall be the subject of negotiations between Mr. Maslonka and EPA and, if necessary, shall be subject to dispute resolution under the Consent Decree.

## E. Additional Success Criteria/Performance Standards and Contingency and Adaptive Measures for Revegetation Work

The discussion in this Section E provides additional detail and requirements for the success criteria/performance standards and first response contingency and adaptive measures for revegetation work (seeding, planting, and weed removal and control).  Accordingly, the additional detail and requirements discussed here supplement the general success criteria/performance standards and first response contingency and adaptive management measures for revegetation work set forth in Table 2.  Mr. Maslonka must satisfy both the requirements set forth here and those in Table 2.

### 1. Native Plantings

For each area where native plantings are required (i.e., the Dam and Sediment Removal and Slope Stabilization Area, the Borrow Area, River Left, River Right 1, and River Right 2), performance for native plantings will be measured using two standards: (1) 85% survival of the native plantings, and (2) maximum 15% weed/non-native vegetation growth.  The two standards must be assessed in each monitoring year by using monitoring techniques such as fixed area plots, line intercept transects, belt transects, or combinations of these and other techniques as appropriate.  Each monitoring location and monitoring technique must be representative of the area or zone where it is located or used.  Mr. Maslonka shall provide the sub-meter latitude and longitude of each location.

As discussed further below, if either of these standards is not met, then Mr. Maslonka shall implement one or more rounds of contingency and adaptive management measures.  If either the survival rate or the weed/non-native vegetation growth will not be able to meet and maintain the 85%/15% success criteria/performance standards after such contingency and adaptive management measures have been implemented, then adequate additional restoration/mitigation work in another form shall be required.  The nature and scope of such additional work shall be the

15

subject of negotiations between Mr. Maslonka and EPA and, if necessary, shall be subject to dispute resolution under the Consent Decree.

## 85% Survival Standard

This standard requires that an 85% survival rate for the installed native woody vegetation be maintained during the monitoring period.  If survival does not meet the 85% standard during the monitoring period, then Mr. Maslonka shall plant additional native vegetation after consulting with EPA regarding the appropriate additional plantings.  The monitoring year for the year after any required additional planting shall be counted as "year 2" so that additional monitoring occurs, at a minimum, that year, the following year (year "3"), two years later (year "5") and two years after that (year "7").

## 15% Weed/Non-native Growth Standard

Weed/non-native vegetation shall be maintained at less than 15% (measured either by canopy (areal) coverage or stem density) during the monitoring period. For this site, weedy species that should be minimized to the greatest extent possible include, but are not limited to, creeping thistle (*Cirsium arvense*), hound's tongue (*Cynoglossum officinale*), horseweed (*Erigeron canadensis*), poison hemlock (*Conium maculatum*), and reed canary grass (*Phalaris arundinacea*). During the monitoring period, the areal coverage of all weedy species shall remain below 15% for the planted or disturbed areas within the mitigation site.

If invasive or non-native species coverage in any of the revegetation areas is greater than 15% during any of the monitoring years, then Mr. Maslonka retains the discretion, provided that plantings required under this plan are not harmed, to control the weed/non-native plants through controlled burning, mechanical removal (e.g., weed-whacking), or treatment with an approved, non-selective, glyphosate [N-(phosphonomethyl) glycine], aquatic herbicide that controls emerged vegetation in environments where water is present.  The herbicide must be applied by a Washington State Licensed Applicator in accordance with the manufacturer's directions and protocols.  Areas greater than 100 square feet where herbicide is required to be applied must also be replanted that year with additional native vegetation after consultation with EPA regarding the appropriate additional plantings.

16

The monitoring year for the year after any required herbicide application (and any associated plantings) shall be counted as "year 2" so that additional monitoring occurs, at a minimum, that year, the following year (year "3"), two years later (year "5") and two years after that (year "7").

If EPA determines that Mr. Maslonka has used his best efforts to comply with the 15% weed/non-native growth standard and reed canary grass (*Phalaris arundinacea)* nonetheless exceeds that standard at any time during the monitoring period, Mr. Maslonka may not be subjected to any penalty under paragraph 39 of the Consent Decree. In order to avoid any penalty, Mr. Maslonka must demonstrate (in a written submission to EPA that specifies and memorializes the details of the efforts undertaken to meet the standard and when those efforts were undertaken) that he has used his best efforts to comply with the 15% weed/non-native growth standard. If EPA determines that Mr. Maslonka used best efforts to comply with the standard and nonetheless was unable to meet it, then the parties shall promptly meet and confer to establish an alternative standard.

## 2. Seeding

For each individual area where seeding is required (i.e., the Borrow Area; and, if seeding is included in the planting take-off table approved by EPA, in the Dam and Sediment Removal and Slope Stabilization Area,  in River Left, in River Right 1, and in River Right 2), performance for seeding will be measured using the percentage standards set forth below in Table 1 for canopy (areal) coverage of the native grasses that have been seeded.   The standard must be assessed in each monitoring year by using monitoring techniques such as fixed area plots, line intercept transects, belt transects, or combinations of these and other techniques as appropriate.  Each monitoring location and monitoring technique must be representative of the area or zone where it is located or used.  Mr. Maslonka shall provide the sub-meter latitude and longitude of each location.

Table 1.  Total percentage of canopy (areal) coverage required for seeding of native grasses.

| Year | Total Percentage of Canopy (Areal) Coverage |
|:---:|:---:|
| 1 | 50 |
| 2 | 50 |
| 3 | 60 |
| 5 | 70 |

CONSENT DECREE & APPENDICES 039

| 7 | 80 |
|---|---|

If canopy (areal) coverage with native grasses does not meet the percentages set forth in Table 1 in year 3, year 5, or year 7, then Mr. Maslonka shall perform additional seeding (and potential weed controls) after consulting with EPA regarding that additional work.  The monitoring year for the year after any required additional seeding or weed control work shall be counted as "year 2" so that additional monitoring occurs, at a minimum, that year, the following year (year "3"), two years later (year "5") and two years after that (year "7").

If canopy coverage will not be able to meet and maintain the 80% success criteria/performance standard in year 7 after such contingency and adaptive management measures have been implemented, then adequate additional restoration/mitigation work in another form shall be required.  The nature and scope of such additional work shall be the subject of negotiations between Mr. Maslonka and EPA and, if necessary, shall be subject to dispute resolution under the Consent Decree.

## Injunction; "Restoration/Mitigation Sites"

As set forth in Paragraph 20 of the Consent Decree, upon completion of the terms and conditions of this plan, Mr. Maslonka shall not mow, cut, clear, cultivate, dredge, excavate, farm, fill, dewater, drain or otherwise disturb in any manner whatsoever any location identified in this plan, except as specified in this plan or approved by EPA.  Those restrictions shall apply to the following areas identified herein: the Dam and Sediment Removal and Slope Stabilization Area; the Additional Downstream Sediment Removal Area; the Borrow Area; River Right 1; River Right 2; and River Left. Those areas are the "Restoration/Mitigation Sites" under Paragraph 5 of the Consent Decree. Notwithstanding the foregoing, nothing in this Consent Decree limits Mr. Maslonka's ability to use Perkins Slough and the Restoration/Mitigation Sites for continued seasonal irrigation, including filling and withdrawing irrigation water from these same areas, provided that those irrigation efforts do not harm the plantings required in those areas.

18

## Literature Cited

Wetland Mitigation in Washington State – Part 1: Agency Policies and Guidance, Version 2, Washington State Department of Ecology, U.S. Army Corps of Engineers Seattle District, and U.S. Environmental Protection Agency Region 10 (2021).

Mitigation Planting Monitoring Report form, U.S. Army Corps of Engineers, Seattle District (available at https://www.nws.usace.army.mil/Portals/27/docs/regulatory/Forms/Mitigation%20MonRpt%20for%20rip%20planting_18Mar2016.pdf).

19

# Table 2

CONSENT DECREE & APPENDICES 042

Table 2.  Summary of Project Standards, Measurements/Documentation, Success Criteria/Performance
Standards, and Recommended First Response Contingency and Adaptive Management Measures

| Project Component | Project Sub-Component | Project standards | Measurements/ Documentation | Success Criteria/ Performance Standards | Recommended First Response Contingency and Adaptive Management Measures |
|---|---|---|---|---|---|
| Dam and Sediment Removal, and Slope Stabilization | | | | | |
| | Dam and sediment removal | As specified in plan(s) approved by EPA, remove dam fill and all of the other fill that has accumulated within the banks of Perkins Slough in the Dam and Sediment Removal and Slope Stabilization Area.  Use and dispose of removed fill as prescribed. | "As-built" submissions, including a minimum of twelve original color photographs (submitted electronically in .jpeg format) taken from set photo-reference locations that are either geotagged or identified by latitude and longitude.  The photographs must be date-stamped and must depict the completed fill removal work and placement of removed fill.  The minimum of twelve photos will be distributed as follows: (a) a minimum of six depicting the | Removal of fill within the banks of Perkins Slough in the Dam and Sediment Removal and Slope Stabilization Area, and the removed fill has been used and disposed of as prescribed. | Should not be applicable because the tasks must be completed properly in the first instance.  However, additional fill removal or proper use or disposal of removed fill may be necessary if work not initially done properly or results are not satisfactory. |

| | | | | | |
|---|---|---|---|---|---|
| | | | completed fill removal work; and (b) a minimum of six depicting the placement of the removed fill. | | |
| | Grading | As specified in plan(s) approved by EPA, grade the channel bottom, channel banks, and adjacent side slopes to match original grades and form smooth transitions to the existing channel bottom, channel banks and side slopes. | "As-built" submissions, including a minimum of six original color photographs (submitted electronically in .jpeg format) taken from set photo-reference locations that are either geotagged or identified by latitude and longitude. The photographs must be date-stamped and must depict the finish grade channel geometry. | Re-creation of pre-disturbance conditions, including original grades and smooth transitions to existing channel, channel banks and side slopes. | Should not be applicable because the tasks must be completed properly in the first instance. However, additional grading may be necessary if work not initially done properly or results are not satisfactory. |
| | Stabilizing graded channel banks and slopes | As specified in plan(s) and planting take-off table approved by EPA:<br><br>(a) Stabilize the graded channel banks and slopes with erosion and sediment control BMPs and bioengineering techniques, using a combination of natural | (a) "As-built" submissions, including a minimum of six original color photographs (submitted electronically in .jpeg format) taken from set photo-reference locations that are | (a) Stabilization of the graded channel banks and slopes using BMPs and bioengineering techniques.<br><br>(b) Creation of terraces or benches suitable to support | (a) Target failing areas and maintain or improve existing BMPs or replace existing BMPS with other bioengineering approaches or systems that do not fail. Thereafter, sparing use of rip-rap along the toe or transitional areas could be considered for use if bi- |

3

| | | materials such as organic geotextiles (e.g. coir cloth), large wood, mulch, native plantings, or the like (but not bank-hardening materials).<br><br>(b) In accordance with Figure 6, create terraces or benches (3 to 5 feet in width) below, at, and slightly above the OHWM on side slopes.<br><br>(c) In general accordance with Table 3 (Planting Recommendations and Take-Offs By Planting Zone), revegetate with native plantings (and implement weed removal and control measures, if included). | either geotagged or identified by latitude and longitude.  The photographs must be date-stamped and must depict the BMPs and bioengineering techniques.<br><br>(b) "As-built" submissions, including a minimum of six original color photographs (submitted electronically in .jpeg format) taken from set photo-reference locations that are either geotagged or identified by latitude and longitude.  The photographs must be date-stamped and must depict the terraces or benches.<br><br>(c) "As Planted" Take Off Tables for each planting zone. | plantings for stabilization.<br><br>(c) (1) 85% survival of the native plantings specified in the planting plans; and (2) maximum 15% weed/non-native vegetation growth. | engineering techniques are shown not to be effective.<br><br>(b) Should not be applicable because the tasks must be completed properly in the first instance.  However, improvement of existing terraces or benches, or construction of new terraces or benches, may be necessary if work not initially done properly or results are not satisfactory.<br><br>(c) Implement in-fill plantings of native species to offset mortality and/or implement additional weed control measures. |
| | Seeding (if included in planting take- | As specified in planting take-off table approved by EPA, and in general | "As Planted" Take Off Tables for each seeding zone. | For canopy (areal) coverage with native grasses: | If canopy (areal) coverage does not meet the required percentages in year 3, year 5, |

4

| | off table approved by EPA) | accordance with Table 3, revegetate with seeding of native grasses (and implement weed removal and control measures, if included). | | Year 1, 50%<br>Year 2, 50%<br>Year 3, 60%<br>Year 5, 70%<br>Year 7, 80% | or year 7, perform additional seeding (and potential weed control). |
|---|---|---|---|---|---|
| **Additional Downstream Sediment Removal** | | | | | |
| | Sediment removal | As specified in plan(s) approved by EPA, remove sediment fill that has accumulated within the banks of Perkins Slough downstream of the dam in the Additional Downstream Sediment Removal Area. Use and dispose of removed fill as prescribed. | "As-built" submissions, including a minimum of twelve original color photographs (submitted electronically in .jpeg format) taken from set photo-reference locations that are either geotagged or identified by latitude and longitude. The photographs must be date-stamped and must depict the completed fill removal work and placement of removed fill. The minimum of twelve photos will be distributed as follows: (a) a minimum of six depicting the completed fill | Removal of fill within the banks of Perkins Slough in the Additional Downstream Sediment Removal Area, and the removed fill has been used and disposed as prescribed. | Should not be applicable because the tasks must be completed properly in the first instance. However, additional fill removal or proper use or disposal of removed fill may be necessary if work not initially done properly or results are not satisfactory. |

5

| | | | removal work; and (b) a minimum of six depicting the placement of the removed fill. | | |
|---|---|---|---|---|---|
| | Grading | As specified in plans(s) approved by EPA, grade the channel bottom, channel banks, and adjacent side slopes to match original grades and form smooth transitions to the existing channel bottom, channel banks and side slopes. | "As-built" submissions, including a minimum of six original color photographs (submitted electronically in .jpeg format) taken from set photo-reference locations that are either geotagged or identified by latitude and longitude. The photographs must be date-stamped and must depict the finish grade channel geometry. | Re-creation of pre-disturbance conditions, including original grades and smooth transitions to existing channel, channel banks and side slopes. | Should not be applicable because the tasks must be completed properly in the first instance. However, additional grading may be necessary if work not initially done properly or results are not satisfactory. |
| **Restoration of Borrow Area** | | | | | |
| | Prior to replacement of any soil in the Borrow Area, loft the existing surface soils as prescribed. Re-fill the Borrow Area | As specified in plan(s) approved by EPA, loft the surface soils and then re-fill  the Borrow Area with material from the removal of the dam and/or the sediment that has accumulated near and downstream of the dam. Finish grade the fill | "As-built" submissions, including a minimum of six original color photographs (submitted electronically in .jpeg format) taken from set photo-reference locations that are | Re-creation of pre-disturbance conditions, including original grades and smooth transitions to surrounding areas. | Should not be applicable because the tasks must be completed properly in the first instance. However, additional grading may be necessary if work not initially done properly or results are not satisfactory. |

CONSENT DECREE & APPENDICES 047

|  |  |  |  |  |  |
|--|--|--|--|--|--|
|  | and mix the re-filling materials with the lofted surface soils as prescribed. | replaced in the Borrow Area to match the grades of the surrounding areas and to form smooth transitions to those surrounding areas. | either geotagged or identified by latitude and longitude. The photographs must be date-stamped and must depict the finish grade. |  |  |
|  | Planting | Prior to planting, clear area of any residual non-native weeds. As specified in planting take-off table approved by EPA, and in general accordance with Table 3, revegetate with native plantings (and implement additional weed removal and control measures, if included). | "As Planted" Take Off Tables for each planting zone. | (1) 85% survival of the native plantings specified in the planting plans; and (2) maximum 15% weed/non-native vegetation growth. | Implement in-fill plantings of native species to offset mortality and/or implement additional weed control measures. |
|  | Seeding | Prior to seeding, clear area of any residual non-native weeds. As specified in planting take-off table approved by EPA, and in general accordance with Table 3, revegetate with seeding of native grasses (and implement additional weed removal and control measures, if included). | "As Planted" Take Off Tables for each seeding zone. | For canopy (areal) coverage with native grasses: Year 1, 50% Year 2, 50% Year 3, 60% Year 5, 70% Year 7, 80% | If canopy (areal) coverage does not meet the required percentages year 3, year 5, or year 7, perform additional seeding (and potential weed control). |
| **Fencing** |  |  |  |  |  |
|  | Fencing (Including Hardened | (a) Install fencing that excludes cattle in accordance with Figures 2 | (a) "As-built" submissions, including a minimum | (a) Fencing that excludes cattle properly installed at | Should not be applicable because the tasks must be completed properly in the |

CONSENT DECREE & APPENDICES 048

| | Entries and Wildlife Openings) | and 7 so that the fencing extends: (a) starting in the south, along the west side of Perkins Slough from the western boundary of Mr. Maslonka's property near Route 20 to approximately the location where the dam was installed; and (b) to the north and northeast from approximately the location where the dam was installed to where Perkins Slough meets the east boundary of Mr. Maslonka's property.

(b) As specified in the plans approved by EPA, in accordance with the locations depicted on Figures 2 and 7, install three hardened entries in accordance with Figure 8c to allow livestock to access water without crossing to the east side of the slough.

(c) In accordance with the depictions in Figures 9A through 9E, install two wildlife openings, sufficiently wide to allow | of thirty-six original color photographs (submitted electronically in .jpeg format) taken from set photo-reference locations that are either geotagged or identified by latitude and longitude.  The photographs must be date-stamped and must depict the completed installations of the fence, including hardened entries and wildlife openings.  The thirty-six photos will be distributed as follows: (a) four photos of each of two locations for the fence installation along the east side of Perkins Slough and four photos of each of two locations for the fence installation easterly to the west boundary of Mr. Maslonka's property (for a total of sixteen photos); (b) four | the required locations.

(b) Three hardened entries, at the locations depicted in Figures 4 and 7, installed in accordance with Figure 8c to allow livestock to access water without crossing to the east side of the slough.

(c) Two wildlife openings, sufficiently wide to allow deer to pass through but narrow enough to prevent cattle from passing through, and in accordance with one of the depictions in Figures 9A through 9E, installed in the new fence that is to be constructed. | first instance.  However, additional work may be necessary if work not initially done properly. |
|---|---|---|---|---|

| | | deer to pass through but narrow enough to prevent cattle from passing through. | photos of each of the hardened entries (a total of twelve photos); and (c) four photos of each of the two wildlife openings (for a total of eight photos). | | |
|---|---|---|---|---|---|
| **Restoration of River Left, River Right 1, and River Right 2** | | | | | |
| | Planting | As specified in planting take-off table approved by EPA, and in general accordance with Table 3, in the areas depicted in Figures 2, 7, 10, 11 and 12 as River Left, River Right 1, and River Right 2, revegetate with native plantings and implement enhanced weed removal and control measures. | "As Planted" Take Off Tables for each zone in River Left, for River Right 1, and for River Right 2. | (1) 85% survival of the native plantings specified in the planting plans; and (2) maximum 15% weed/non-native vegetation growth. | Implement in-fill plantings of native species to offset mortality and/or implement additional weed control measures. |
| | Seeding (if included in planting take-off table approved by EPA) | As specified in planting take-off table approved by EPA, and in general accordance with Table 3, in the area depicted in Figures 2 and 10 as River Left, revegetate with seeding of native grasses and implement enhanced weed removal and control measures. | "As Planted" Take Off Tables for each zone in River Left, for River Right 1 and for River Right 2. | For canopy (areal) coverage with native grasses: Year 1, 50% Year 2, 50% Year 3, 60% Year 5, 70% Year 7, 80% | If canopy (areal) coverage does not meet the required percentages year 3, year 5, or year 7, perform additional seeding (and potential weed control). |

9

# Table 3

CONSENT DECREE & APPENDICES 051

**Table 3 (Planting Recommendations and Take-Offs By Planting Zone)**

**Table 3a. Proposed Restoration Plantings & Specifications for Perkins Slough Dam and Sediment Removal and Slope Stabilization Area**

| Plant Type | Common Name | Scientific Name | Wetland Indicator Rating[1] | Planting Location | Installation Technique[2] | Spacing (on center) | Planting per Area | Planting Quantities |
|---|---|---|---|---|---|---|---|---|
| Tree | Speckled alder | *Alnus incana* ssp. *tenuifolia* | FACW | Toe of slope to middle of bank | Cuttings | 12 ft | 1 per 144 SF | 45 |
| | Scouler's willow | *Salix scouleriana* | FAC | Toe of slope to top of bank | Cuttings | 4 ft | 1 per 16 SF | 20 |
| Shrub | Red-oiser dogwood | *Cornus stolonifera (C. alba, C. sericea)* | FACW | Toe of slope to middle of bank | Cuttings | 4 ft | 1 per 16 SF | 20 |
| | Sandbar willow | *Salix exigua* | FACW | Toe of slope to middle of bank | Cuttings | 4 ft | 1 per 16 SF | 20 |

[1] FACW=Facultative Wetland; FAC= Facultative
[2] Cuttings should be harvested in mid-autumn to late winter when dormant. Select vigorous shoots, remove leaves. Cut cleanly above a bud at the top, with a sloping cut to shed water and cut straight across at the base. Cuttings can be kept in water up to 24 hours. Prior to planting dip lower end in a rooting hormone. Insert cuttings into moist soil with 2/3 of the stem below the ground surface.
Note: Total Area = 37,026 SF (0.85 acres); actual planting footprint = 20% of Total Area = approx. 7,405 SF.

Total # of Plantings in Sediment Removal and Slope Stabilization Treatment Zone = 105.

2

**Table 3b. Proposed Restoration Plantings & Specifications for the Borrow Area**

| Plant Type | Common Name | Scientific Name | Wetland Indicator Rating[1] | Planting Location | Installation Technique[2] | Spacing (on center) | Planting per Area | Planting Quantities |
|---|---|---|---|---|---|---|---|---|
| Tree recommendations | Quaking aspen | *Populus tremuloides* | FACU | Clustered along the top of bank | 1 gallon container | 15 ft | 1 per 225 SF | 19 |
| | Ponderosa pine | *Pinus ponderosa* | FACU | Outer (eastern) edges of scraped area to fence line/parcel boundary | 1 gallon container | 20 ft | 1 per 400 SF | 19 |
| | Douglas Fir | *Pseudotsuga menziesii* | FACU | Outer (eastern) edges of scraped area to fence line/parcel boundary | 1 gallon container | 20 ft | 1 per 400 SF | 19 |
| Shrub recommendations | Serviceberry | *Amelanchier alnifolia* | FACU | Scattered in open areas between top of bank and fence line/parcel boundary | 1 gallon container | 12 ft | 1 per 144 SF | 19 |
| | Creeping Oregon-grape | *Berberis repens* (*Mahonia repens*) | UPL | Clustered in open areas between top of bank and fence line/parcel boundary | 1 gallon container | 4 ft | 1 per 16 SF | 19 |
| | Nootka rose | *Rosa nutkana* | FACU | Clustered in open areas between top of bank and fence line/parcel boundary | 1 gallon container | 6 ft | 1 per 36 SF | 19 |
| | Common snowberry | *Symphoricarpos albus* | FACU | Scattered in open areas between top of bank and fence line/parcel boundary | 1 gallon container | 4 ft | 1 per 16 SF | 19 |
| Forb recommendations | Big-leaf lupine | *Lupinus polyphyllus* | FAC | Clustered in open areas between top of bank and fence line/parcel boundary | 1 gallon container | 4 ft | 1 per 16 SF | 19 |

3

| Plant Type | Common Name | Scientific Name | Wetland Indicator Rating[1] | Planting Location | Installation Technique[2] | Spacing (on center) | Planting per Area | Planting Quantities |
|---|---|---|---|---|---|---|---|---|
| Native Graminoids required | Smooth aster | *Symphyotrichum laeve* | FACU | Clustered in open areas between top of bank and fence line/parcel boundary | 1 gallon container | 2-3 ft | 1 per 9 SF | 19 |
| | Pine bluegrass | *Poa secunda* | FACU | Clustered in open areas between top of bank and fence line/parcel boundary | 1 gallon container | 2-3 ft | 1 per 9 SF | 19 |
| | Idaho fescue | *Festuca idahoensis* | FACU | Clustered in open areas between top of bank and fence line/parcel boundary | 1 gallon container | 2-3 ft | 1 per 9 SF | 19 |

[1] FAC= Facultative; FACU= Facultative Upland; UPL=Upland

[2] Container plants should be sourced from eastern Washington. All container-grown plants should be placed by hand in a planting hole that is at least two times the diameter and 4 to 6 inches deeper than the container the plant was grown in. If soil is not damp when planting, the planting holes should be pre-soaked. When backfilling the planting hole, care should be taken to make sure that soil around the base of the plant is at approximately the same height or slightly higher than the soil adjacent to the planting hole. Soil should be packed around each newly installed plant and all plants should be watered immediately following installation.

Note: Total Area = 24,400 SF (0.56 acres); actual planting footprint = 100% of Total Area.

Total # of Plantings in Borrow Area Treatment Zone = 209.

4

**Table 3c.     Proposed Plantings & Specifications for River Left Point Bar and Hay Field Treatment Zones**

| Plant Type | Common Name | Scientific Name | Wetland Indicator Rating[1] | Planting Location | Installation Technique[2] | Spacing (on center) | Planting per Area | Planting Quantities |
|---|---|---|---|---|---|---|---|---|
| **Point Bar Treatment Zone** | | | | | | | | |
| | Willows | *Salix exigua or scouleriana* | FAC & FACW, respectively | Install live stakes slightly below and above the OHWM throughout the Point Bar Zobne | Live stake installation | Massed or installed 4 -5 ft on centers | 1 per 16 SF | 32 |
| **Hay Field Treatment Zone** | | | | | | | | |
| Tree | Quaking aspen | *Populus tremuloides* | FACU | Clustered along outer edges of shrub carr | 1 gallon container | 15 ft | 1 per 225 SF | 32 |
| | Black cottonwood | *Populus trichocarpa* | FAC | Clustered in openings in shrub carr along the top of bank | 1 gallon container | 15 ft | 1 per 225 SF | 32 |
| | Ponderosa pine | *Pinus ponderosa* | FACU | Clustered along outer edges of shrub carr | 1 gallon container | 20 ft | 1 per 400 SF | 32 |
| | Douglas Fir | *Pseudotsuga menziesii* | FACU | Clustered along outer edges of shrub carr | 1 gallon container | 20 ft | 1 per 400 SF | 32 |
| Shrub | Serviceberry | *Amelanchier alnifolia* | FACU | Scattered along outer | 1 gallon container | 12 ft | 1 per 144 SF | 32 |

5

| Plant Type | Common Name | Scientific Name | Wetland Indicator Rating[1] | Planting Location | Installation Technique[2] | Spacing (on center) | Planting per Area | Planting Quantities |
|---|---|---|---|---|---|---|---|---|
| | | | | edges of shrub carr | | | | |
| | Red-oiser dogwood | *Cornus stolonifera (C. alba, C. sericea)* | FACW | Clustered in openings in shrub carr along the top of bank | 1 gallon container | 4 ft | 1 per 16 SF | 32 |
| | Nootka rose | *Rosa nutkana* | FACU | Scattered along outer edges of shrub carr | 1 gallon container | 6 ft | 1 per 36 SF | 32 |
| | Common snowberry | *Symphoricarpos albus* | FACU | Scattered along outer edges of shrub carr | 1 gallon container | 4 ft | 1 per 16 SF | 32 |

[1] FACW= Facultative Wetland; FAC= Facultative; FACU= Facultative Upland; UPL=Upland

[2] Container plants should be sourced from eastern Washington. All container-grown plants should be placed by hand in a planting hole that is at least two times the diameter and 4 to 6 inches deeper than the container the plant was grown in. If soil is not damp when planting, the planting holes should be pre-soaked. When backfilling the planting hole, care should be taken to make sure that soil around the base of the plant is at approximately the same height or slightly higher than the soil adjacent to the planting hole. Soil should be packed around each newly installed plant and all plants should be watered immediately following installation.

Note: Total Area = 1.41 acres; actual planting footprint = 75% of Total Area = approx. 46,064 SF.

Total # of Plantings in River Left Point Bar and Hay Field Treatment Zones = 288.

6

**Planting Take Off Table 3d. Proposed Plantings & Specifications for Riparian Plant Community Enhancement Within River Right 1 and River Right 2, Maslonka Property**

| Plant Type | Common Name | Scientific Name | Wetland Indicator Rating[1] | Planting Location | Installation Technique[2] | Spacing (ft on center) | Planting per Area | Planting Quantities |
|---|---|---|---|---|---|---|---|---|
| Trees | Quaking aspen | *Populus tremuloides* | FACU | Plant in clumps (to emulate clones) in openings in the existing riparian plant community on the Slough right banks | 1 gallon container | Closely spaced clumps to emulate clones | 1 per 16 SF | 80 |
| | Black cottonwood | *Populus trichocarpa* | FAC | Plant live stakes in openings in the existing riparian plant community at the top of bank and midway down gently sloping banks | 1 gallon container | 15 | 1 per 225 SF | 70 |
| | Ponderosa pine | *Pinus ponderosa* | FACU | Plant individual or 2-3 stems in a small clump within openings in the existing riparian plant community – choose full sunlight | 1 gallon container | 20 | 1 per 400 SF | 70 |
| | Douglas Fir | *Pseudotsuga menziesii* | FACU | Plant individual stems or 2-3 stems within openings in the existing riparian plant community – choose full sunlight to partial shade | 1 gallon container | 20 | 1 per 400 SF | 70 |
| Shrubs | Serviceberry | *Amelanchier alnifolia* | FACU | Plant scattered individuals within openings in the existing riparian plant community | 1 gallon container | 12 | 1 per 144 SF | 70 |
| | Red-oiser dogwood | *Cornus stolonifera (C. alba, C. sericea)* | FACW | Plant scattered individuals within openings in the existing riparian plant community | 1 gallon container | 4 | 1 per 16 SF | 46 |

7

| Plant Type | Common Name | Scientific Name | Wetland Indicator Rating[1] | Planting Location | Installation Technique[2] | Spacing (ft on center) | Planting per Area | Planting Quantities |
|---|---|---|---|---|---|---|---|---|
| | Nootka rose | *Rosa nutkana* | FACU | Plant scattered individuals within openings in the existing riparian plant community | 1 gallon container | 6 | 1 per 36 SF | 70 |
| | Common snowberry | *Symphoricarpos albus* | FACU | Plant scattered individuals within openings in the existing riparian plant community | 1 gallon container | 4 | 1 per 16 SF | 50 |

[1] FACW= Facultative Wetland; FAC= Facultative; FACU= Facultative Upland; UPL=Upland.

[2] Container plants should be sourced from eastern Washington. The distribution/allocation among the species planted should be roughly equal among those listed. All container-grown plants should be placed by hand in a planting hole that is at least two times the diameter and 4 to 6 inches deeper than the container. If soil is not damp when planting, the planting holes should be pre-soaked. When backfilling the planting hole, mix in two handfuls of slow-release nitrogen fertilizer (e.g. Osmocote) and make sure that soil around the base of the plant covers the root/shoot transition and that finish grades are approximately the same height or slightly higher than the soil adjacent to the planting hole. Soil should be lightly packed around each newly installed plant and all plants should be watered immediately following installation.

Note: Total Areas (2), minus borrow area (0.56 acres) = 5.81 acres;

actual planting footprint = 35% of Total Area = approx. 88, 580 SF.

Total # of Plantings in River Right 1 and River Right 2 (minus the borrow area) = 526.

8

# Table 4

CONSENT DECREE & APPENDICES 059

**Table 4.  Restoration/Mitigation Plan
Deadlines For Work Described in Sections A, B and C[1]**

| Task | Deadline |
|---|---|
| Submission of Planting Take-Off Table | July 15, 2023 |
| Submission of plans for design of on-site work discussed in Section A | July 15, 2023 |
| Notification of EPA with "target" date for commencing on-site work (other than fencing) | No less than 45 days before commencing on-site work |
| Notification of EPA with actual date for commencing on-site work (other than fencing) | No less than 30 days before commencing on-site work |
| Dam and Sediment Removal, and Slope Stabilization | October 15, 2023 (with the exception of installing cuttings, which shall be completed by November 15, 2023, or the first set of 2023 hard frosts, whichever is earlier; in addition, if Mr. Maslonka is unable to complete containerized native plantings by October 15, 2023, despite required efforts, the deadline to complete the remaining plantings is June 15, 2024) |
| Additional Downstream Sediment Removal | October 15, 2023 |
| Restoration of Borrow Area | October 15, 2023 (if Mr. Maslonka is unable to complete containerized native plantings by this date despite required efforts, the deadline to complete the remaining plantings is June 15, 2024) |
| Revegetation of River Left, River Right 1, River Right 2 | October 15, 2023 (if Mr. Maslonka is unable to complete containerized native plantings by this date despite required efforts, the deadline to complete the remaining plantings is June 15, 2024) |
| Submission of plans for hardened entries for cattle to access Perkins Slough without crossing to east side of the slough | January 15, 2024 |
| Fencing (Including Hardened Entries and Wildlife Openings) | May 15, 2024 |

---

[1]  This table is a summary, for ease of reference, of formal deadlines established in the Restoration/Mitigation Plan for the work discussed in Sections A, B and C.  Preparatory work to meet these deadlines (e.g., obtaining required permits and other authorizations) is not addressed here, and Mr. Maslonka remains responsible both for completing the preparatory work and for meeting the deadlines set forth in Sections A, B and C.  In addition, Mr. Maslonka remains responsible for complying with other deadlines in the Restoration/Mitigation Plan (e.g., submission of monitoring reports by December 1 of the applicable year) and elsewhere in the Consent Decree.

2

# Figure 1



LEGEND

Flow Path
OHWM
Parcel

Pend Oreille River

Perkins Slough

Pend Oreille River

Perkins Slough

Pend Oreille River

Kalispel Indian Reservation

Cusick

Sources: Lidar/DTM - Washington Lidar Portal.  USGS
National Map. Parcel Boundary - ESRI. All Remaining
Data - GPS Collection by L.C. Lee & Associates Inc.

FIGURE 1

Perkins Slough with Vicinity Inset
Maslonka Property
Pend Oreille County, WA

Version 6

November 2, 2022

CONSENT DECREE & APPENDICES 062

# Figure 2



R:\Projects\Storrer\Lyndon Lee\Maslonska\Figures\Mitigation Plan\v7\b_maslonka-mitigationplan-figure2-projects.mxd

| Sources: Lidar/DTM - Washington Lidar Portal. USGS National Map. Parcel Boundary - ESRI. All Remaining Data - GPS Collection by L.C. Lee & Associates Inc. | FIGURE 2 | Maslonka Project Components/Areas<br>Maslonka Property<br>Pend Oreille County, WA | Version 7 | April 18, 2023 |
|---|---|---|---|---|

# Figure 3



LEGEND

▭ Parcel Boundary

▭ Dam and Sediment Removal and Slope Stabilization Area (0.27 acres)

✕ Cattle Exclusion Fencing

▶ Flow Path

Top of Bank (TOB)

Ordinary High Water Mark (OHWM)

Perkins Slough

USA KALISPEL TRIBE OF INDIANS / BROCK & MASLONKA

Sources: Lidar/DTM - Washington Lidar Portal.  USGS National Map. Parcel Boundary - ESRI. All Remaining Data - GPS Collection by L.C. Lee & Associates Inc.

FIGURE 3

**Dam and Sediment Removal and Slope Stabilization Area Maslonka Property Pend Oreille County, WA**

**Version 6**

November 2, 2022

# Figure 4



Hardened Entry for
Livestock Watering Access

Perkins Slough

USAKUSPEL TRIBE OF INDIANS
BROCKAMASLONKA

**LEGEND**

▭ Parcel Boundary
▭ Additional Downstream Sediment Removal Area (0.58 acres)
× Cattle Exclusion Fencing
▶ Flow Path
— Top of Bank (TOB)
– – Ordinary High Water Mark (OHWM)

Feet
0            50            100

Sources: Lidar/DTM - Washington Lidar Portal.  USGS
National Map. Parcel Boundary - ESRI. All Remaining
Data - GPS Collection by L.C. Lee & Associates Inc.

**FIGURE 4**

**Additional Downstream
Sediment Removal Area
Maslonka Property
Pend Oreille County, WA**

**Version 6**

November 2, 2022

# Figure 5



Perkins Slough

USA KALISPEL TRIBE OF INDIANS
BROCKA/MASLONKA

**LEGEND**

| | |
|---|---|
| | Parcel Boundary |
| | Borrow Area (0.56 acres) |
| | Cattle Exclusion Fencing |
| | Flow Path |
| | Top of Bank (TOB) |
| | Ordinary High Water Mark (OHWM) |

N
W — E
S

Feet
0          50          100

| Sources: Lidar/DTM - Washington Lidar Portal. USGS National Map. Parcel Boundary - ESRI. All Remaining Data - GPS Collection by L.C. Lee & Associates Inc. | **FIGURE 5** | **Borrow Area Maslonka Property Pend Oreille County, WA** | **Version 6** | November 2, 2022 |
|---|---|---|---|---|

CONSENT DECREE & APPENDICES 070

# Figure 6



| Sources: T-O Engineers, January 2019 | **FIGURE 6** | **2-Staged Channel Design**<br>**Maslonka Property**<br>**Pend Oreille County, WA** | **Version 6** | November 2, 2022 |

# Figure 7



Hardened Entry for Livestock Watering Access

River Right 2

River Left

River Right 1

Perkins Slough

Hardened Entry for Livestock Watering Access

Hardened Entry for Livestock Watering Access

Pend Oreille

Pend Oreille River

Pend Oreille

Pend Oreille

N
W    E
S

Feet
0        500        1:000

**LEGEND**

☐ Parcel Boundary
×–×– Cattle Exclusion Fencing
▶▶ Flow Path
----- OHWM
☐ River Left, River Right 1, and River Right 2

| Sources: Lidar/DTM - Washington Lidar Portal. USGS National Map. Parcel Boundary - ESRI. All Remaining Data - GPS Collection by L.C. Lee & Associates Inc. | **FIGURE 7** | **Fencing System for Maslonka Property Pend Oreille County, WA** | **Version 7** | April 18, 2023 |

# Figures 8A-8c

Figures 8A and 8B – Examples of Hardened Entries for Livestock Watering Access

8A



8B





Detail - Hardened Entry for
Livestock Watering Access

Permanent Water

<---- 12 ft ---->

Fence or
Moveable Panels

Fence or Panels →    Quarry Spoils
(3-4 yds³)    ← Fence or Panels

OHWM

Turf

SCALE: NOT TO SCALE

| | FIGURE 8c | Hardened Entry for Livestock Watering Access Maslonka Property Pend Oreille County, WA | Version 6 | November 2, 2022 |
|---|---|---|---|---|

# Figures 9A-9E

Figures 9 A, B, C, D, and E – Examples of Wildlife Friendly Fencing and Fence Openings
[Source – A Landowners Guide to Wildlife Friendly Fences.pdf]

9A – Post and Rail or Post and Wire Options 1 and 2





9B – Post and Rail Option 3



1

## 9C – Smooth Wire Fence Option



## 9D – Combination Smooth Wire and Barbed Wire Option



## 9E – PVC Covering Barbed Wire Option

Note – The top two and bottom two wires are gathered into PVC covers to create an easy passage.



2

# **Figure 10**



LEGEND

☐ Parcel Boundary
☐ River Left (2.79 acres)
✕ Cattle Exclusion Fencing
▶▶ Flow Path
— Top of Bank (TOB)
--- Ordinary High Water Mark (OHWM)

Hay Field Treatment Zone (1.41 acres)

Point Bar Treatment Zone (0.29 acres)

Perkins Slough

USAKLISPEL TRIBE OF INDIANS

BROCKAMASLONKA

Sources: Lidar/DTM - Washington Lidar Portal. USGS National Map. Parcel Boundary - ESRI. All Remaining Data - GPS Collection by L.C. Lee & Associates Inc.

FIGURE 10

River Left
Maslonka Property
Pend Oreille County, WA

Version 7

April 18, 2023

# Figure 11



Perkins Slough

USA/KALISPEL TRIBE OF INDIANS
BROCKA/MASLONKA

**LEGEND**

| | |
|---|---|
| | Parcel Boundary |
| | River Right 1 (3.54 acres) |
| X — | Cattle Exclusion Fencing |
| ▶▶ | Flow Path |
| — | Top of Bank (TOB) |
| – – | Ordinary High Water Mark (OHWM) |

Feet
0        150        300

Sources: Lidar/DTM - Washington Lidar Portal.  USGS National Map. Parcel Boundary - ESRI. All Remaining Data - GPS Collection by L.C. Lee & Associates Inc.

**FIGURE 11**

**River Right 1
Maslonka Property
Pend Oreille County, WA**

**Version 7**

April 18, 2023

CONSENT DECREE & APPENDICES 084

# **Figure 12**



Perkins Slough

USA KALISPEL TRIBE OF INDIANS

BROCKA MASLONKA

**LEGEND**

☐ Parcel Boundary
☐ River Right 2 (2.83 acres)
✕ Cattle Exclusion Fencing
▶▶ Flow Path
— Top of Bank (TOB)
- - - Ordinary High Water Mark (OHWM)

Feet
0        150        300

Sources: Lidar/DTM - Washington Lidar Portal.  USGS National Map. Parcel Boundary - ESRI. All Remaining Data - GPS Collection by L.C. Lee & Associates Inc.

**FIGURE 12**

**River Right 2**
**Maslonka Property**
**Pend Oreille County, WA**

**Version 7**

April 18, 2023

# Figure 13



**Maslonka Area/Volume Calculations**

Dam Footprint Area = 5,092 ft²
Volume of Material in Dam = 968 yds³

Sediment Plume Area = 21,932 ft²
Estimated Volume of Sediment Plume = 2,341 yds³

Sluff Area = 2,217 ft²

Scraped Area (Upland) = 14,839 ft²

Potential Restoration Area = 34,843 ft²

Dam Rupture Area

**LEGEND**

- ● Sediment Sampling (depth in FT)
- ● Culvert
- ▬ Sediment Transects
- ▶▶ Flow Path
- ▬ TOB
- ▬ ▬ OHWM

- ▨ Potential Restoration Area
- ▨ Dam
- ▨ Sluff Area of Dam
- ▨ Sediment Accumulation
- ▨ Scraped Area (Upland)
- ▨ Parcel

**FIGURE 13**

**Sediment Transects
Maslonka Property
Pend Oreille
Spokane, Washington**

October 5, 2021

# Figure 14



**Figure 14**

# Photographs 1-11

## List of Photographs Cited

| Photograph # | Title |
|---|---|
| 1 | View of the Pend Oreille River Valley North of Cusick WA Showing the Locations of Perkins Slough, the Maslonka Property, Cusick, and the U.S. Geological Service Stream Gauge at Cusick |
| 2 | Close-Up of Perkins Slough on the Maslonka Property |
| 3 | The Maslonka Dam in Perkins Slough |
| 4 | View of the Maslonka Dam on June 4, 2021. View is northeast and downstream. |
| 5 | The Maslonka Dam in Perkins Slough on June 4, 2021 |
| 6 | Close Up of the Breech in the Maslonka Dam During the September 21, 2021 Low Water Visit |
| 7 | View of the Sediment Plume in Perkins Slough Immediately Downstream from the Maslonka Dam and Below the OHWM on September 16, 2021 |
| 8 | View of the Sediment Plume and Failing/Sluffing Slopes on the Downstream Face of the Maslonka Dam in Perkins Slough |
| 9 | Scour and Sluffing Areas On and Near the Downstream Face of the Maslonka Dam |
| 10 | Close-Up of Scour Slope Failures on the North (Slough Left) Side of Perkins Slough, Downstream of the Maslonka Dam on September 16, 2021 |
| 11 | Channel Bank Scour and Slope Failures At and Below the OHWM on the Upstream Face and Immediately Upstream from the Maslonka Dam On September 16, 2021 |

Photograph 1. View of the Pend Oreille River Valley North of Cusick, WA, Showing the Locations of Perkins Slough, the Maslonka Property, Cusick, and the U.S. Geological Service Stream Gauge at Cusick.
Source: Google Earth

Photograph 2. Close-Up of Perkins Slough on the Maslonka Property. View is to the north. Flow in Perkins Slough is from left (west) to right (east) in the photograph. The Blue Arrow shows the location of the Maslonka Dam and the sediment plume.
Source: Google Earth



Photograph 3. The Maslonka Dam in Perkins Slough. View is to the northwest and upstream.



Photograph 4. View of the Maslonka Dam on June 4, 2021. View is northwest and upstream.



Photograph 5. The Maslonka Dam in Perkins Slough on June 4, 2021. View is generally west by southwest and upstream.  The breech in the dam is on the right side of the Photograph (Blue Arrow).



Photograph 6. Close-Up of the Breech in the Maslonka Dam on September 21, 2021. View is southwest and upstream. Note the channel bank instability (scour erosion) on the right side (Slough left looking downstream) of the Photograph.



Photograph 7. View of the Sediment Plume in Perkins Slough Immediately Downstream from the Maslonka Dam and Below the OHWM on September 16, 2021. View is northeast and downstream to the Maslonka property line (east).



Photograph 8. View of the sediment plume and failing/sluffing slopes on the downstream face of the Maslonka Dam in Perkins Slough. This is the downstream face of the dam and field crew are standing well below the OHWM on September 16, 2021. View is generally southeast and downstream. Note extensive cattle tracks in the Slough channel bottom.



Photograph 9. Scour and Sluffing Areas On and Near the Downstream Face of the Maslonka Dam. View is west and upstream.



Photograph 10. Close-Up of Scour Slope Failures on the North (Slough Left) Side of Perkins Slough, Downstream of the Maslonka Dam on September 16, 2021.



Photograph 11. Channel Bank Scour and Slope Failures At and Below the OHWM on the Upstream Face and Immediately Upstream from the Maslonka Dam On September 16, 2021.View is southeast and upstream.



# Appendix B
# to Consent Decree

# Preservation Plan

# Preservation Plan

## Pend Oreille County, Washington

**June 2023**

1

## Introduction

This preservation plan has been developed for submission to the Court as an appendix to, and to be included as part of, the Consent Decree in *United States v. Maslonka*, No. 2:20-CV-00304-SAB (E.D. Wash.).  The defendant in this action is Brock Maslonka, who is solely responsible for performance under the Consent Decree, including this preservation plan.  Mr. Maslonka also is responsible for timely raising any concerns regarding the work and other measures set forth in this plan.

## Project Location and Overview

This preservation plan is to be implemented on property owned by Mr. Maslonka and/or affiliates of Mr. Maslonka, approximately 3 miles north of the Town of Cusick, Pend Oreille County, Washington.  The subject property is described as follows: Parcel Number 433301449001 (Legal Description: (3-59 F4 SE1\4SE1\4 EAST OF HWY 01-33-43); Parcel Number 433312009001 (Legal Description: 3-59 H1 F4 E1\2NE1\4 EAST OF ROAD LESS ROAD 12-33-43); Parcel Number 43312009002 (Legal Description: 3-59 H1 F4 E1/2NE1/4 W OF RD, SW1/4NE1/4, SE1/4NW1/4, SW1/4, SE1/4 LESS TAX 1, 2, & 3 12-33-43); Parcel Number 433301449002 (Legal Description: 3-59 F4 SE1\4SE1\4 WEST OF HWY 01-33-43).

The County Parcel Numbers for the parcels at issue are 433301449001, 433312009001, 433312009002, and 433301449002.  This plan is intended to preserve specified areas within those parcels in perpetuity through deed restrictions. The location of the parcels is depicted in Figure 1 attached hereto.  The areas within those parcels that are to be subject to the deed restrictions also are depicted in Figure 1 attached hereto. Those areas are the "Preservation Sites" under Paragraph 5 of the Consent Decree.

This plan focuses on mitigation of impacts stemming from earthwork and dam construction in Perkins Slough during September 2015, and emergency response work within Perkins Slough in February 2016. The dam is located approximately 0.25 miles east of Highway 20 and 0.5 miles west of the Pend Oreille River along Perkins Slough.  The latitude/longitude coordinates for the approximate center of the dam site are 48.376669/-117.300364.

## Compliance With Applicable Law

All work performed under this plan shall be performed in accordance with applicable law, including, without limitation, the requirements of all applicable laws, permits, conditions, and authorizations.  This preservation plan is not a permit or authorization issued under any law.  To perform the work set forth in this preservation plan, Mr. Maslonka remains responsible for obtaining all necessary permits and other authorizations, if any, required by federal, state, local, and any other regulatory bodies.

2

## Specifications for Deed Restrictions

No later than January 15, 2024, Mr. Maslonka shall ensure that permanent deed restrictions become effective on the areas depicted in Figure 1. The deed restrictions shall prevent those areas in perpetuity from any development, farming, and other activities that would detract from or reduce their environmental functions and values.  However, Mr. Maslonka and any subsequent owner will maintain the right to continue using those areas for all of their historical uses, including cattle grazing and use or irrigation of the water situated between the parcels, subject to these deed restrictions.  The deed restrictions must be acceptable to EPA. No later than November 15, 2023, Mr. Maslonka shall submit for EPA's review and comment the proposed deed restrictions, including, without limitation, the terms of the restrictions and the survey, including a metes and bounds and legal description, of each of the areas subject to the permanent deed restrictions.  EPA shall provide comments to Mr. Maslonka by December 15, 2023.  Mr. Maslonka shall then incorporate EPA's comments and ensure that the permanent deed restrictions take effect and are recorded against the affected property with the county auditor as discussed above in this paragraph.

## Specific Activities Allowed

As set forth in Paragraph 22 of the Consent Decree, Mr. Maslonka shall not mow, cut, clear, cultivate, dredge, excavate, farm, fill, dewater, drain or otherwise disturb in any manner whatsoever the areas identified in this plan for the deed restrictions discussed herein; provided, however, that, consistent with the terms of this preservation plan and notwithstanding the terms of Paragraph 22 of the Consent Decree, Mr. Maslonka and any subsequent owner will maintain the right to continue using those areas for all of their historical uses, including cattle grazing and use or irrigation of the water situated between the parcels, subject to the deed restrictions to be imposed under this plan.

3

# Figure 1



LEGEND
Pend Oreille County Parcels
Preservation Area

| Sources: Lidar/DTM - Washington Lidar Portal.  USGS National Map. Parcel Boundary - State of Washington. | FIGURE 1 | Preservation Areas Maslonka Project Pend Oreille County, WA | Version 1 | May 9, 2023 |