# Conceptual Perkins Slough Restoration/Mitigation Plan

## Maslonka Property
## Cusick, Pend Oreille County, Washington

**June 2023**


# Table of Contents

Introduction ............................................................................................................................................... 3
Project Location, Overview, and Prior Notifications to EPA .............................................................. 3
Site Description ....................................................................................................................................... 4
Compliance With Applicable Law ........................................................................................................ 5
Specifications for Restoration/Mitigation ............................................................................................ 5
    A.   Dam and Sediment Removal, and Slope Stabilization ........................................................... 6
        1.   Work Preparation ................................................................................................................ 6
        2.   Dam Removal, Removal of Adjacent Fill, and Stabilization ........................................... 7
        3.   Additional Downstream Sediment Removal .................................................................... 8
        4.   Restoration of Borrow Area .............................................................................................. 10
    B.   Fencing (Including Hardened Entries and Wildlife Openings) ........................................... 11
    C.   Restoration of River Left, River Right 1, and River Right 2 ................................................ 12
    D.   Completion Dates, Documentation of Work, Monitoring, and General Contingency and Adaptive Management Measures .......................................................................................... 12
    E.   Additional Success Criteria/Performance Standards and Contingency and Adaptive Measures for Revegetation Work ........................................................................................... 14
        1.   Native Plantings ................................................................................................................. 14
        2.   Seeding ................................................................................................................................ 16
Injunction; "Restoration/Mitigation Sites" ......................................................................................... 17
Literature Cited ..................................................................................................................................... 18

## Introduction

This restoration/mitigation plan has been developed for submission to the Court as an appendix to, and to be included as part of, the Consent Decree in *United States v. Maslonka*, No. 2:20-CV-00304-SAB (E.D. Wash.). The defendant in this action is Brock Maslonka, who is solely responsible for performance under the Consent Decree, including this restoration/mitigation plan. Mr. Maslonka also is responsible for timely raising any concerns regarding the work and other measures set forth in this plan.

## Project Location, Overview, and Prior Notifications to EPA

This restoration/mitigation plan is to be implemented primarily on property owned by Mr. Maslonka, approximately 2.5 miles north of the Town of Cusick, Pend Oreille County, Washington. The subject property is located in the NW ¼ of Township 33 North, Range 44 East, Section 07 in Pend Oreille County, Washington. The County Parcel Number that is the main focus of this plan is 443307509002, and certain portions of this plan also include County Parcel Numbers 443318500002, and 443307509001. This plan focuses on mitigation of impacts stemming from earthwork and dam construction in Perkins Slough during September 2015, and emergency response work within Perkins Slough in February 2016. The dam is located approximately 0.25 miles east of Highway 20 and 0.5 miles west of the Pend Oreille River along Perkins Slough. The latitude/longitude coordinates for the approximate center of the dam site are 48.376669/-117.300364. (For the general location and aerial depictions of the property, *see* Figure 1 and Photograph 1.)

Among other things, this plan is intended to restore the previously filled segment of Perkins Slough and to enhance vegetative structure and habitat functioning in accordance with the general principles outlined in the *Wetland Mitigation in Washington State – Part 1: Agency Policies and Guidance, Version 2*, Washington State Department of Ecology, U.S. Army Corps of Engineers Seattle District, and U.S. Environmental Protection Agency Region 10 (2021) (Washington State Department of Ecology Publication #21-06-003).

The restoration/mitigation efforts include the following general tasks: removal of fill from Perkins Slough, including removal of the dam and the sediment deposited upstream and downstream of the dam; stabilizing the dam site and nearby areas; grading the bottom and banks of Perkins Slough to pre-disturbance conditions, including creating smooth, stable transitions to surrounding slopes; revegetation through seeding, planting of prescribed native plants, and weed removal and control

measures at designated locations; and fencing in designated areas sufficient to exclude cattle, with wildlife openings and hardened entries for livestock to access water without crossing to the east side of the slough. The overall restoration/mitigation approach and more details about the components of the plan and required follow-up efforts are discussed in the subsequent sections of this plan and its attachments.

No less than 45 days before Mr. Maslonka commences the on-site work (other than fencing, including hardened entries and wildlife openings) described in this plan, Mr. Maslonka shall provide EPA with notice of the "target" date on which Mr. Maslonka intends to commence that work. In addition, no less than 30 days before Mr. Maslonka commences that work, Mr. Maslonka shall provide EPA with notice of the actual date on which Mr. Maslonka will commence that work.

## Site Description

The restoration/mitigation site is located along a segment (reach) of Perkins Slough. The site currently contains fill material linked to a constructed earthen dam within the channelized portion of Perkins Slough and it includes other areas near the slough. Perkins Slough generally supports a mix of herbaceous vegetation (mainly dominated by reed canary grass) and scattered, low-growing shrub species (mainly hawthorns and snowberry) and some trees. Perkins Slough is one piece of the tributary and wetlands ecosystems that serve the Pend Oreille River Valley north of Cusick and that support a variety of flora and fauna.

The dam is depicted in Photographs 2-6 and 9 and Figures 13 and 14 attached hereto. Estimates of the volume of fill material in the dam have ranged from approximately 700 to 1,000 cubic yards of fill material. In addition, the sediment has accumulated near the dam, including in a sediment plume downstream of the dam, as depicted in Photographs 7-9 attached hereto and Figures 13 and 14 attached hereto.

The Pend Oreille River flows northerly, approximately 0.5 miles to the east of the site. Perkins Slough, which traverses through the site, has connectivity with the Pend Oreille River. Water levels are seasonally influenced from the river and run-off from higher adjacent elevations.

Within the Cusick area, average temperatures are around 79°F in the summer and 37°F in the winter, with an average annual rainfall of 26.0 inches and average snowfall of 53.0 inches. Land uses within the general proximity of the restoration site are almost exclusively agricultural.

## Compliance With Applicable Law

All work performed under this plan shall be performed in accordance with applicable law, including, without limitation, the requirements of all applicable laws, permits, conditions, and authorizations.

This restoration/mitigation plan is not a permit or authorization issued under any law. To perform the work set forth in this restoration/mitigation plan, Mr. Maslonka will need to obtain all necessary permits and other authorizations required by federal, state, local, and any other regulatory bodies. It is anticipated Mr. Maslonka will be able to timely obtain the necessary permits and authorizations to perform under the terms of this plan. To the extent Mr. Maslonka is unable to timely obtain permits or authorizations required for work to be performed starting as early as August 15, 2023 (as set forth below), Mr. Maslonka shall immediately notify EPA and provide EPA with an estimated date of compliance. It is anticipated that, as appropriate, EPA will support Mr. Maslonka's requests for permits with federal, state, and/or local bodies in order to comply with the deadlines set forth in Table 4.

The following permits or authorizations are listed for informational purposes: (a) Clean Water Act section 404 (Nationwide Permit 32); (b) Section 106 of the National Historic Preservation Act; (c) Clean Water Act section 401 Water Quality Certification (Administered by the Washington State Department of Ecology and by the Kalispel Tribe of Indians); (d) Hydraulics Projects Approval (Administered by Washington Department of Fish and Wildlife); and (e) Shoreline Master Program (Pend Oreille County). The list does not necessarily include all such permits or authorizations required and not all of those listed necessarily are required here.

## Specifications for Restoration/Mitigation

The restoration/mitigation work described in this plan must be accomplished safely and without further environmental damage. The work must be performed in accordance with the descriptions below and must achieve the project standards and success criteria/performance standards set forth below and those set forth in Table 2 attached hereto.

The project standards summarize the restoration/mitigation work that is required and guide the work activities toward proper completion, including meeting the success criteria/performance standards, which set forth criteria that must be met for each sub-component of the work. Mr. Maslonka also shall provide the Measurements/Documentation elements set forth in Table 2. Those elements set forth the methods required to document the work and whether it has been

completed properly. In addition, if any component or sub-component of the work does not meet the success criteria/performance standards set forth in Table 2 (after the work is initially completed or subsequently monitored for compliance, as appropriate), then Mr. Maslonka shall implement the Recommended First Response Contingency and Adaptive Management Measures. Those measures are the first responses to foreseeable failures that may occur (e.g., plant mortality). If those measures do not adequately address the failure to achieve the project standards and success criteria/performance standards, then Mr. Maslonka shall coordinate with EPA to develop and implement other measures or other restoration/mitigation work to address those failures.

As discussed further below, native plantings are required at five locations: (1) the "Dam and Sediment Removal and Slope Stabilization Area"; (2) the "Borrow Area"; (3) "River Left"; (4) River Right 1"; and (5) "River Right 2." It is expected that approximately 25% of the native plantings will consist of live cuttings from local sources (e.g., Mr. Maslonka's property) and approximately 75% will be bare root or potted/containerized stock that is sourced from Eastern Washington, with a particular focus on the Cusick, Pend Oreille County and Spokane County area (provenance).

The discussion below refers to a planting "take-off table" (Table 3, "Planting Recommendations and Take-Offs By Planting Zone") that shall guide the native plantings and seeding work required under this plan. The native plantings and seeding work must be completed in general accordance with Table 3 but Mr. Maslonka retains discretion to adjust the native plantings and seeding if necessary. No later than July15, 2023, Mr. Maslonka shall submit a revised planting "take-off" table (including anticipated weed removal and control measures) to the Environmental Protection Agency (EPA) for review, and must receive approval from EPA prior to conducting any of the plantings or seeding work. After the native plantings and seeding have been completed, Mr. Maslonka shall submit "As-Planted" tables that specify and document any weed removal and control measures implemented, the native plantings that were planted, and the seeding work performed, in each area (and within each "zone" of the River Left area, as discussed further below).

## A. Dam and Sediment Removal, and Slope Stabilization

### 1. Work Preparation

Prior to initiation of the on-site work discussed in this section A, Mr. Maslonka shall hire a qualified Geotechnical/Engineering professional to design the work, including, without limitation, removal plans, grading plans, work sequencing, installation of "Best Management Practices" (BMPs) protections, upland disposal location for removed fill, and contingency measures. Mr. Maslonka

shall submit these plans to the Environmental Protection Agency (EPA) for review no later than July 15, 2023, and must receive approval from EPA prior to initiating the work.  Prior to commencing this work, Mr. Maslonka also shall install required aquatic species protection systems, water diversion/by-pass and dewatering systems (likely including a coffer dam), and erosion and sediment control BMPs (e.g., sediment fences, energy dissipation systems) in compliance with the Construction Stormwater General Permit for Washington State (Construction Stormwater General Permit - Washington State Department of Ecology).

### 2.  Dam Removal, Removal of Adjacent Fill, and Stabilization

The location for this component and associated sub-components of the work includes Perkins Slough and a 30-foot revegetated riparian buffer area.  This location is depicted in Figures 2 and 3 as the "Dam and Sediment Removal and Slope Stabilization Area." Photographs 2-10 and Figures 13 and 14 also depict this area.

All work below the Ordinary High Water Mark (OHWM) at this location shall take place between August 15 - October 1, 2024, and must be done during low flow and with dry conditions (during dry parts of the dry season).  In addition, to avoid soil compaction, appropriate low impact and low ground pressure equipment shall be used for this sub-component of the work (e.g., excavation, loading, and hauling of excavated materials; grading channel banks; and stabilizing channel banks and slopes).  For work sequencing, it is expected that the sediment plume downstream of the dam, which is depicted in Figures 2 and 4 as the "Additional Downstream Sediment Removal Area" and is discussed further below, will be removed prior to removal of the dam fill and other fill that has accumulated within the banks of Perkins Slough in the Dam and Sediment Removal and Slope Stabilization Area.

All of the dam fill (estimated at approximately700-1,000 CY) within the channel of Perkins Slough shall be removed.  All of the other fill that has accumulated within the banks of Perkins Slough in the Dam and Sediment Removal and Slope Stabilization Area also shall be removed.

The removed fill may be used at this location (i.e., within the Dam and Sediment Removal and Slope Stabilization Area), where needed, to provide appropriate grade and depth (including terraces or benches, as described below) for prescribed plantings in this area.  Fill that is not used for these activities shall first be placed in the Borrow Area that is depicted in Figures 2 and 5.  If there is fill remaining after sufficient fill has been placed in the Borrow Area to complete the restoration of that

area as described below, then the remaining sediment fill shall be spread evenly at an upland location that is at least 100 feet from the OHWM of Perkins Slough and has been approved by EPA.

After removal of the fill within the Dam and Sediment Removal and Slope Stabilization Area, the channel bottom of Perkins Slough shall be restored to the "pre-disturbance" condition that existed before the dam was installed and sediment accumulated. The channel bottom of Perkins Slough that was beneath the fill must be finish graded to match original grades and to form smooth transitions to existing upstream and downstream channel grades, channel banks and side slopes. Mr. Maslonka also shall grade the channel banks and adjacent side slopes to match original grades and form smooth transitions to the "pre-disturbance" channel bottom, channel banks and slopes. To the extent feasible, Mr. Maslonka shall avoid disturbing native vegetation.

Mr. Maslonka will create terraces or benches (3 to 5 feet in width) below, at, and slightly above the OHWM on the slough's side slopes to minimize the potential for erosion and increase the complexity of possible planting surfaces and submerged areas. Figure 6 provides a depiction of how the terracing or benching will be done.

Mr. Maslonka shall then stabilize the graded channel banks and slopes with erosion and sediment control BMPs and bioengineering techniques, using a combination of natural materials such as organic geotextiles (e.g. coir cloth), large wood, mulch, native plantings, or the like. Bank-hardening materials such as concrete and gabions shall not be used. The use of riprap along the toe or transitional areas could be considered for use if bio-engineered techniques are shown not to be effective. If applied, riprap quantities shall be utilized sparingly.

Planting of native plants (and seeding if it is included in the planting take-off table submitted by Mr. Maslonka and approved by EPA) shall then be performed in general accordance with Table 3. In addition, Mr. Maslonka may include weed removal and control measures.

### 3. Additional Downstream Sediment Removal

The location of this work is the sediment plume downstream of the dam that is depicted in Figures 2 and 4 as the "Additional Downstream Sediment Removal Area." Photographs 2 and 7-10 also depict portions of this area. Excavated pits and probes from 2021 show that the plume is generally wedge-shaped and narrows in width downstream. The depth of the sediment plume varies. The point of contact between the sediment material and the original channel bottom of Perkins Slough typically is clear, abrupt, and distinct.

All work below the OHWM at this location shall take place between August 15 - October 1, 2024, and must be done during low flow and with dry conditions (during dry parts of the dry season). In addition, to avoid soil compaction, appropriate low impact and low ground pressure equipment shall be used for this sub-component of the work (e.g., excavation, loading, and hauling of excavated materials). As discussed above, it is expected that the sediment in this area will be removed prior to the removal of the dam fill and other fill that has accumulated within the banks of Perkins Slough in the Dam and Sediment Removal and Slope Stabilization Area. It also is expected that Mr. Maslonka will excavate to the point of contact between the sediment plume material and the original channel bottom (i.e., neither shallower nor deeper). It is anticipated that the work will start at the downstream end of the plume and move upstream toward the dam unless downstream ponding or saturation prevents that sequencing; however, Mr. Maslonka's agents may alter this anticipated sequencing based on their expertise and experience, and using accepted industry practices. Furthermore, it is expected that EPA and/or an outside consultant for EPA will be present on-site when this work commences and will observe some or all of this sediment removal work, including achievement of the finish grades. EPA and/or its outside consultant will provide direction (if requested) regarding the removal and will determine in their reasonable discretion whether the work has been completed in accordance with this plan.

It is anticipated that all of the fill (sediment) in the Additional Downstream Sediment Removal Area will be removed. Nonetheless, if Mr. Maslonka is unable, despite demonstrated good-faith efforts, to secure access to the portion of the sediment plume that extends downstream beyond his property line, then that portion of the sediment plume need not be removed. In addition, if any portion of the sediment plume in the Additional Downstream Sediment Removal Area is covered with surface water when the removal work is to occur, and Mr. Maslonka determines that the removal of that portion of the sediment plume should not take place because removal may cause environmental damage, then Mr. Maslonka shall provide EPA with notice and allow EPA ten working days thereafter to assess and recommend whether removal of that portion of the sediment plume should occur. Mr. Maslonka shall then follow EPA's recommendation.

The removed fill (sediment) may be used within the Dam and Sediment Removal and Slope Stabilization Area, where needed, to provide appropriate grade and depth (including terraces or benches, as described above) for prescribed plantings in that area. Fill that is not used for these activities shall first be placed in the Borrow Area that is depicted in Figures 2 and 5. If there is fill remaining after sufficient fill has been placed in the Borrow Area to complete the restoration of that

area as described below, then the remaining sediment fill shall be spread evenly at an approved upland location at least 100 feet from the OHWM of Perkins Slough.

After the sediment plume in the Additional Downstream Sediment Removal Area is removed, the channel bottom of Perkins Sough shall be restored to the "pre-disturbance" condition that existed before the dam was installed and sediment accumulated. The channel bottom of Perkins Slough that was beneath the sediment plume must be finish graded to match original grades and to form smooth transitions to existing upstream and downstream channel grades, channel banks and side slopes. To the extent feasible, Mr. Maslonka shall avoid disturbing native vegetation.

### 4. Restoration of Borrow Area

The Borrow Area is adjacent to the dam and south of Perkins Slough, and is depicted in Figures 2 and 5. It is the area from which Mr. Maslonka removed fill material for construction of the dam. The restoration of the Borrow Area as described in this plan must be completed no later than October 1, 2024.

During August 2022, technical representatives of EPA and Mr. Maslonka observed that the soil in the Borrow Area was quite dry and that there was pronounced compaction and cracking of the surface soils. In addition, organic matter content in the Borrow Area soil was quite low. The dry, compacted, and relatively infertile soil presents difficult conditions for successful revegetation unless efforts are made to address those conditions.

Prior to replacement of any soil in the Borrow Area, the surface soils in the Borrow Area shall be ripped or disced (and thus lofted) with equipment passes that are generally perpendicular to each other. After the existing soils in the Borrow Area have been lofted, the Borrow Area must be re-filled with a combination of (a) material from the removal of the dam and/or the sediment that has accumulated near and downstream of the dam, as discussed above, and (b) organic material (which can be locally sourced, including from composted manure obtained from Mr. Maslonka's ranching operations). It is expected that at least four inches of these combined materials will be required to support successful revegetation efforts.

These materials must be mixed into the lofted surface soils using an efficient combination of equipment such as a track hoe, a bulldozer rigged with gang rippers, or a tractor/disc. In addition, the fill replaced in the Borrow Area must be finish graded to match the grades of the surrounding area and to form smooth transitions to those surrounding areas.

After the Borrow Area has been re-filled as discussed above, planting of native plants shall be performed in general accordance with Table 3. The Borrow Area also must be broadcast or hydro seeded with a native mix of grasses in general accordance with Table 3. Prior to planting and seeding, the borrow area must be cleared of any residual non-native weeds.

### B. Fencing (Including Hardened Entries and Wildlife Openings)

No later than May 15, 2024, fencing shall be installed in accordance with Figures 2 and 7. Consistent with those depictions, Mr. Maslonka will install the fencing so that it extends: (a) starting in the south, along the west side of Perkins Slough from the western boundary of Mr. Maslonka's property near Route 20 to approximately the location where the dam was installed; and (b) to the north and northeast from approximately the location where the dam was installed, along the west side of Perkin's Slough, to where Perkins Slough meets the east boundary of Mr. Maslonka's property. With the exception of the hardened entries discussed below, the fencing must exclude cattle.

Three hardened entries must be installed in the new or existing fence along the west side of Perkins Slough, in accordance with the locations depicted on Figures 4 and 7. The entries shall provide livestock with access to water without causing harm to the Perkins Slough channel banks and they shall not allow cattle to cross to the east side of the slough. The hardened entries are a riparian zone management BMP and shall be designed and installed in general accordance with the depictions in Figure 8c. (Figures 8a and 8b are depictions of hardened entries that are included for illustrative purposes. The hardened entries must be installed in accordance with Figure 8c.) No later than January 15, 2024, Mr. Maslonka shall submit plans for constructing the hardened entries to EPA. These design documents shall include: the location of the hardened entries; a depiction of the hardened entries; the maximum quantity of rock placed to be placed below the OHWM; the size and shape of the rock; the sourcing of the rock; the maximum size, number, and location of pilings to be driven (if any); construction sequencing; BMPs; and applicable avoidance, minimization and mitigation of any temporary and permanent impacts to aquatic resources that may occur during installation. Mr. Maslonka must receive approval from EPA prior to installing the hardened entries.

There shall be two wildlife openings in the new fence that is to be constructed. Those openings shall be sufficiently wide to allow deer to pass through but narrow enough to prevent cattle to pass

through. The wildlife openings shall be designed and installed in accordance with one of the depictions in Figures 9A through 9E.

The fencing (along with the hardened entries and wildlife openings) shall be maintained for a minimum of 10 years after the Effective Date of the Consent Decree and thereafter for as long as Mr. Maslonka retains a beneficial interest in the fenced property and grazes cattle on that property.

### C. Restoration of River Left, River Right 1, and River Right 2

Revegetation with native plantings shall be conducted, and enhanced weed removal and control measures shall be implemented, at the three locations depicted in Figures 2, 7, 10, 11 and 12 as River Right 1, River Right 2, and River Left. Cattle will be excluded from these areas by fencing, as discussed above.

Specifically, in the areas depicted as River Right 1, River Right 2, and River Left, planting of native plants (and seeding if it is included in the planting take-off table submitted by Mr. Maslonka and approved by EPA) shall be performed in general accordance with Table 3 (Planting Recommendations and Take-Offs By Planting Zone). Enhanced weed removal and control measures also shall be performed in River Right 1, River Right 2, and River Left. The restoration work at these sites shall be completed without damaging existing native plants.

As set forth in Figure 10 and Table 3, the River Left area includes two distinct zones: (a) the "Point Bar Treatment Zone" immediately above and below the OHWM and (b) the "Hay Field Treatment Zone" located due west of the existing riparian forest and scrub/shrub plant community. These two zones shall be planted with separate sets of native trees and shrubs. (Seeding will be required in one or both of these zones if it is included in the planting take-off table approved by EPA).

### D. Completion Dates, Documentation of Work, Monitoring, and General Contingency and Adaptive Management Measures

Sections A, B and C above set forth certain dates by which components or sub-components of the work are to be completed. A summary of such completion dates is also set forth in Table 4 attached hereto. Mr. Maslonka must meet both the completion dates set forth in Sections A, B and C above and the deadline dates set forth in Table 4.

As set forth in Table 2, Mr. Maslonka shall provide "As Built" or "As Planted" submissions to EPA for each sub-component of the work. The submissions shall depict the completed work and must include a photo inventory of that work. The specifications for the photo inventory for each sub-

component are included in Table 2.  The "As-Built" and "As Planted" submissions must be made by December 1 of the year that Mr. Maslonka completes the sub-component of the work.

Mr.  Maslonka shall monitor all areas where work is required under this plan.   After "year zero," which is the year that Mr. Maslonka completes the sub-component of the work and makes the corresponding "As Built" or "As Planted" submissions to EPA, monitoring (and reporting) is required in years 1, 2, 3, 5, and 7 (i.e., "year zero" plus 1, 2, 3, 5, and 7).

Mr. Maslonka shall submit monitoring reports in electronic format (via email or other electronic transmission, and not on hard devices such as flash drives or CDs) to EPA by December 1 of each year that the monitoring is required.  The reports shall be formatted consistent with the 2016 *Mitigation Monitoring Report* form generated by the Seattle District of the U.S. Army Corps of Engineers.[1]  The reports must include a photo inventory of each sub-component of the work, consistent with the specifications for the photo inventories that are included in Table 2.  Each photograph must be geotagged or include a description of the latitude and longitude for the location where the photograph was taken.

For each sub-component of the work set forth in Table 2, the reports must address achievement of, progress toward, or movement away from the applicable success criteria/performance standards.  The reports must address any issues that may impact the achievement of the project standards and success criteria/performance standards.

The reports also must document the stability of finish grades, side slope bioengineering and planting areas, and cattle exclusion fencing (including wildlife openings and hardened entries).  The reports must catalogue plantings (and seeding, where applicable) according to their condition (i.e., living and vigorous, stressed, or dead) and document non-native plant and invasive weed conditions, including the percentage of weed cover in the revegetation area.  The reports must also identify any maintenance concerns, including the need for other maintenance activities, and any contingency and any adaptive management measures employed.

---

[1]  The form is available at: https://www.nws.usace.army.mil/Portals/27/docs/regulatory/Forms/Mitigation%20MonRpt%20for%20rip%20planting_18Mar2016.pdf.

Contingency and adaptive management measures must be employed for each sub-component of the work that is not meeting the success criteria/performance standards set forth in Table 2 (and as discussed below in more detail for revegetation work). In that event, Mr. Maslonka shall implement the Recommended First Response Contingency and Adaptive Management Measures as set forth in Table 2 (and as discussed below in more detail for revegetation work). If those measures do not correct the deficiencies, then Mr. Maslonka shall coordinate with EPA to implement other measures that may include, for example: additional plantings; supplemental watering; re-grading; additional weed treatments and removals; re-seeding; extension of the monitoring period; and additional monitoring points. If such other measures do not cause the sub-component of the work to meet the applicable success criteria/performance standards, then Mr. Maslonka shall coordinate with EPA about developing and implementing other restoration/mitigation work. The nature and scope of such additional work shall be the subject of negotiations between Mr. Maslonka and EPA and, if necessary, shall be subject to dispute resolution under the Consent Decree.

### E. Additional Success Criteria/Performance Standards and Contingency and Adaptive Measures for Revegetation Work

The discussion in this Section E provides additional detail and requirements for the success criteria/performance standards and first response contingency and adaptive measures for revegetation work (seeding, planting, and weed removal and control). Accordingly, the additional detail and requirements discussed here supplement the general success criteria/performance standards and first response contingency and adaptive management measures for revegetation work set forth in Table 2. Mr. Maslonka must satisfy both the requirements set forth here and those in Table 2.

#### 1. Native Plantings

For each area where native plantings are required (i.e., the Dam and Sediment Removal and Slope Stabilization Area, the Borrow Area, River Left, River Right 1, and River Right 2), performance for native plantings will be measured using two standards: (1) 85% survival of the native plantings, and (2) maximum 15% weed/non-native vegetation growth. The two standards must be assessed in each monitoring year by using monitoring techniques such as fixed area plots, line intercept transects, belt transects, or combinations of these and other techniques as appropriate. Each monitoring location and monitoring technique must be representative of the area or zone where it is located or used. Mr. Maslonka shall provide the sub-meter latitude and longitude of each location.

As discussed further below, if either of these standards is not met, then Mr. Maslonka shall implement one or more rounds of contingency and adaptive management measures. If either the survival rate or the weed/non-native vegetation growth will not be able to meet and maintain the 85%/15% success criteria/performance standards after such contingency and adaptive management measures have been implemented, then adequate additional restoration/mitigation work in another form shall be required. The nature and scope of such additional work shall be the subject of negotiations between Mr. Maslonka and EPA and, if necessary, shall be subject to dispute resolution under the Consent Decree.

85% Survival Standard

This standard requires that an 85% survival rate for the installed native woody vegetation be maintained during the monitoring period. If survival does not meet the 85% standard during the monitoring period, then Mr. Maslonka shall plant additional native vegetation after consulting with EPA regarding the appropriate additional plantings. The monitoring year for the year after any required additional planting shall be counted as "year 2" so that additional monitoring occurs, at a minimum, that year, the following year (year "3"), two years later (year "5") and two years after that (year "7").

15% Weed/Non-native Growth Standard

Weed/non-native vegetation shall be maintained at less than 15% (measured either by canopy (areal) coverage or stem density) during the monitoring period. For this site, weedy species that should be minimized to the greatest extent possible include, but are not limited to, creeping thistle (*Cirsium arvense*), hound's tongue (*Cynoglossum officinale*), horseweed (*Erigeron canadensis*), poison hemlock (*Conium maculatum*), and reed canary grass (*Phalaris arundinacea*). During the monitoring period, the areal coverage of all weedy species shall remain below 15% for the planted or disturbed areas within the mitigation site.

If invasive or non-native species coverage in any of the revegetation areas is greater than 15% during any of the monitoring years, then Mr. Maslonka retains the discretion, provided that plantings required under this plan are not harmed, to control the weed/non-native plants through controlled burning, mechanical removal (e.g., weed-whacking), or treatment with an approved, non-selective, glyphosate [N-(phosphonomethyl) glycine], aquatic herbicide that controls emerged vegetation in environments where water is present. The herbicide must be applied by a

Washington State Licensed Applicator in accordance with the manufacturer's directions and protocols. Areas greater than 100 square feet where herbicide is required to be applied must also be replanted that year with additional native vegetation after consultation with EPA regarding the appropriate additional plantings.

The monitoring year for the year after any required herbicide application (and any associated plantings) shall be counted as "year 2" so that additional monitoring occurs, at a minimum, that year, the following year (year "3"), two years later (year "5") and two years after that (year "7").

If EPA determines that Mr. Maslonka has used his best efforts to comply with the 15% weed/non-native growth standard and reed canary grass (*Phalaris arundinacea)* nonetheless exceeds that standard at any time during the monitoring period, Mr. Maslonka may not be subjected to any penalty under paragraph 39 of the Consent Decree. In order to avoid any penalty, Mr. Maslonka must demonstrate (in a written submission to EPA that specifies and memorializes the details of the efforts undertaken to meet the standard and when those efforts were undertaken) that he has used his best efforts to comply with the 15% weed/non-native growth standard. If EPA determines that Mr. Maslonka used best efforts to comply with the standard and nonetheless was unable to meet it, then the parties shall promptly meet and confer to establish an alternative standard.

2.  **Seeding**

For each individual area where seeding is required (i.e., the Borrow Area; and, if seeding is included in the planting take-off table approved by EPA, in the Dam and Sediment Removal and Slope Stabilization Area, in River Left, in River Right 1, and in River Right 2), performance for seeding will be measured using the percentage standards set forth below in Table 1 for canopy (areal) coverage of the native grasses that have been seeded. The standard must be assessed in each monitoring year by using monitoring techniques such as fixed area plots, line intercept transects, belt transects, or combinations of these and other techniques as appropriate. Each monitoring location and monitoring technique must be representative of the area or zone where it is located or used. Mr. Maslonka shall provide the sub-meter latitude and longitude of each location.

Table 1. Total percentage of canopy (areal) coverage required for seeding of native grasses.

| Year | Total Percentage of Canopy (Areal) Coverage |
|---|---|
| 1 | 50 |

| | |
|---|---|
| 2 | 50 |
| 3 | 60 |
| 5 | 70 |
| 7 | 80 |

If canopy (areal) coverage with native grasses does not meet the percentages set forth in Table 1 in year 3, year 5, or year 7, then Mr. Maslonka shall perform additional seeding (and potential weed controls) after consulting with EPA regarding that additional work. The monitoring year for the year after any required additional seeding or weed control work shall be counted as "year 2" so that additional monitoring occurs, at a minimum, that year, the following year (year "3"), two years later (year "5") and two years after that (year "7").

If canopy coverage will not be able to meet and maintain the 80% success criteria/performance standard in year 7 after such contingency and adaptive management measures have been implemented, then adequate additional restoration/mitigation work in another form shall be required. The nature and scope of such additional work shall be the subject of negotiations between Mr. Maslonka and EPA and, if necessary, shall be subject to dispute resolution under the Consent Decree.

## Injunction; "Restoration/Mitigation Sites"

As set forth in Paragraph 20 of the Consent Decree, upon completion of the terms and conditions of this plan, Mr. Maslonka shall not mow, cut, clear, cultivate, dredge, excavate, farm, fill, dewater, drain or otherwise disturb in any manner whatsoever any location identified in this plan, except as specified in this plan or approved by EPA. Those restrictions shall apply to the following areas identified herein: the Dam and Sediment Removal and Slope Stabilization Area; the Additional Downstream Sediment Removal Area; the Borrow Area; River Right 1; River Right 2; and River Left. Those areas are the "Restoration/Mitigation Sites" under Paragraph 5 of the Consent Decree. Notwithstanding the foregoing, nothing in this Consent Decree limits Mr. Maslonka's ability to use Perkins Slough and the Restoration/Mitigation Sites for continued seasonal irrigation, including filling and withdrawing irrigation water from these same areas, provided that those irrigation efforts do not harm the plantings required in those areas.

## Literature Cited

Wetland Mitigation in Washington State – Part 1: Agency Policies and Guidance, Version 2, Washington State Department of Ecology, U.S. Army Corps of Engineers Seattle District, and U.S. Environmental Protection Agency Region 10 (2021).

Mitigation Planting Monitoring Report form, U.S. Army Corps of Engineers, Seattle District (available at https://www.nws.usace.army.mil/Portals/27/docs/regulatory/Forms/Mitigation%20MonRpt%20for%20rip%20planting_18Mar2016.pdf).

# Table 4

**Table 4. Restoration/Mitigation Plan**
**Deadlines For Work Described in Sections A, B and C**[1]

| Task | Deadline |
| --- | --- |
| Submission of Planting Take-Off Table | July 15, 2023 |
| Submission of plans for design of on-site work discussed in Section A | July 15, 2023 |
| Notification of EPA with "target" date for commencing on-site work (other than fencing) | No less than 45 days before commencing on-site work |
| Notification of EPA with actual date for commencing on-site work (other than fencing) | No less than 30 days before commencing on-site work |
| Dam and Sediment Removal, and Slope Stabilization | October 1, 2024 |
| Additional Downstream Sediment Removal | October 1, 2024 |
| Restoration of Borrow Area | October 1, 2024 |
| Revegetation of River Left, River Right 1, River Right 2 | October 1, 2024 |
| Submission of plans for hardened entries for cattle to access Perkins Slough without crossing to east side of the slough | January 15, 2024 |
| Fencing (Including Hardened Entries and Wildlife Openings) | May 15, 2024 |

---

[1] This table is a summary, for ease of reference, of formal deadlines established in the Restoration/Mitigation Plan for the work discussed in Sections A, B and C. Mr. Maslonka must meet both the completion dates set forth in Sections A, B and C and the deadline dates set forth above in this table. Preparatory work to meet these deadlines (e.g., obtaining required permits and other authorizations) is not addressed here, and Mr. Maslonka remains responsible both for completing the preparatory work and for meeting the deadlines set forth in Sections A, B and C. In addition, Mr. Maslonka remains responsible for complying with other deadlines in the Restoration/Mitigation Plan (e.g., submission of monitoring reports by December 1 of the applicable year) and elsewhere in the Consent Decree.